## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CONVERDYN**<br>   **7800 East Dorado Place, Suite 200**<br>   **Greenwood Village, CO 80111**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**ERNEST J. MONIZ, in his official capacity as**<br>**Secretary of the United States Department of Energy,**<br><br>**and**<br><br>**UNITED STATES DEPARTMENT OF ENERGY**<br>   **1000 Independence Avenue, S.W.**<br>   **Washington, D.C. 20585**<br><br>      **Defendants.** | **Case No.**<br>**1:14-cv-1012** |

### COMPLAINT

Plaintiff ConverDyn brings this action seeking declaratory and injunctive relief against Ernest J. Moniz, Secretary of the United States Department of Energy, and the United States Department of Energy for violations of the United States Enrichment Corporation Privatization Act, 42 U.S.C. § 2297h, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

### INTRODUCTION

1.      Plaintiff ConverDyn brings this action to stop the Department of Energy ("DOE") from unlawfully transferring large quantities of uranium currently in the government's possession in various forms.  The transfers would have an immediate and ongoing impact on the market for uranium conversion services, would harm the United States' domestic conversion industry, and threaten the United States' energy security and energy independence.

2.      Plaintiff ConverDyn is the *sole* domestic supplier of uranium conversion services in the United States.  "Conversion" is an indispensable step in the processing of uranium for use as fuel in nuclear power reactors.

3.      In 1996, Congress passed the United States Enrichment Corporation Privatization Act ("USEC Privatization Act") which placed limits on DOE's ability to transfer or sell government-owned uranium in order to protect the domestic uranium mining, conversion, and enrichment industries.

4.      Among other restrictions, the Act prohibits DOE from selling or transferring government-owned uranium unless the Secretary of the Department of Energy (the "Secretary") makes a determination, at least every two years, that sales or transfers will not have an adverse material impact on the United States' domestic uranium mining, conversion, or enrichment industries (the "Determination").

5.      The Secretary issued the most recent Determination on May 15, 2014.

6.      As with past Determinations, the Secretary received and relied on a market impact study commissioned by DOE to assess the impact on the commercial markets associated with DOE transfers.

7.      While past studies concluded that the transfers would not have an adverse material impact on the domestic fuel cycle industries, the most recent study underlying the May 2014 Determination *did not adopt such a conclusion*.

8.      According to the market impact study prepared for DOE and a detailed impact assessment provided by ConverDyn to DOE prior to the Determination, DOE's release of substantial quantities of uranium into the market will have immediate and ongoing adverse impacts on the domestic conversion industry.  These impacts include lost sales, increased

production costs, near- and long-term price suppression, and changed customer practices.  DOE sales will reduce ConverDyn revenue by more than $10 million per year over the period covered by the Determination.

9.      Notwithstanding the report's findings on the fragile state of the conversion market, and despite receiving comments from ConverDyn and others highlighting the negative effects of DOE transfers, the Secretary determined that the transfers would not have an adverse material impact on the domestic uranium mining, conversion, and enrichment industries.  The Secretary gave *no explanation* of the basis for his determination.

10.     The first transfer under this Determination is scheduled to take place on July 15, 2014.

11.     The Secretary's Determination is arbitrary and capricious, and otherwise not in accordance with law.  The Determination is unsupported by the administrative record before the agency, ignores and is contrary to evidence in the record, is not supported by adequate reasoning or explanation, and does not consider or ignores comments from the domestic uranium mining, conversion, and enrichment industries.

12.     DOE has also violated legal requirements by authorizing transfers of conversion and enrichment services, which are not permitted under the USEC Privatization Act, and by receiving less than the fair market value for the material transferred or sold.

13.     At bottom, DOE failed to satisfy the conditions that were placed on its transfers by Congress in order to protect the domestic conversion industry.

**PARTIES**

14.     Plaintiff ConverDyn is a partnership, whose partners include affiliates of Honeywell International Inc. ("Honeywell"), and is based in Greenwood Village, Colorado.

15.     Defendant Ernest J. Moniz is the Secretary of the United States Department of Energy with authority over the transfer of DOE uranium inventories.  He is sued in his official capacity.

16.     The United States Department of Energy is an executive agency of the United States government.

17.     The Secretary maintains the headquarters of DOE in Washington, D.C.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this case pursuant to 42 U.S.C. § 2297h, *et seq.*; 5 U.S.C. §§ 702 and 706; and 28 U.S.C. § 1331.  The Court may issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

19.     Venue in this Court is proper under 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

### Domestic Production of Uranium Hexafluoride

20.     ConverDyn is the exclusive agent for sales of conversion services at the Metropolis Works facility in Metropolis, Illinois.

21.     The Metropolis Works facility converts uranium oxide (also know as "yellowcake") into uranium hexafluoride ("UF6") gas.  "Conversion" is a critical step in the process of producing the fuel used by nuclear power plants.

22.     Metropolis Works is the only facility in the United States capable of converting uranium oxide into UF6.  Metropolis Works is one of only four primary suppliers of uranium conversion services worldwide.

23.     Honeywell owns and operates Metropolis Works.

24.    Both the U.S. Congress and DOE recognize the importance of maintaining a domestic conversion industry to the nation's energy security and energy independence.

25.    In a December 2000 report to Congress, DOE addressed the question of "Why Is It Important for the United States to Maintain a Conversion Industry?" and noted that a viable domestic conversion industry:

- Provides an integrated domestic supply source to meet U.S. utility nuclear fuel requirements.

- Avoids over reliance on foreign sources of nuclear fuel supply, helps to maintain fair pricing by foreign suppliers, and increases assurance of supply.

- Provides a key element that facilitates the successful implementation of [agreements between the United States and Russia to deweaponize enriched uranium in Russia's nuclear arsenal].

- Reduces fuel costs of U.S. nuclear utilities by facilitating exchanges of feed material that minimize transportation costs.

- Increases safety by reducing uranium cylinder handling.

- Helps provide assured operation of U.S. enrichment plants . . . .  In the case of a foreign supply disruption, a domestic convertor can help maintain a secure source of supply . . . .

- Provides positive earnings important to the U.S. balance of trade.

<u>Sales of Uranium (Including UF6) by DOE</u>

26.    DOE holds inventories of uranium in various quantities and forms, including UF6.

27.    In 1996, Congress passed the United States Enrichment Corporation Privatization Act.  As indicated by its title, the USEC Privatization Act authorized the transformation of the United States Enrichment Corporation—then a Government-owned entity that enriched uranium for use in nuclear power plants—into a private enterprise.

28.     In recognition of the harmful impact that DOE sales and transfers of uranium from its inventories could have on the marketplace for uranium and related fuel cycle services, including conversion, the USEC Privatization Act limits DOE's ability to sell or transfer the uranium it holds.

29.     These limits on DOE's ability to sell or transfer its uranium inventories aim to prevent DOE from flooding the market with uranium and thereby displace sales, drive down prices, and otherwise harm the domestic uranium mining, conversion, or enrichment industries, including ConverDyn.

30.     The USEC Privatization Act provides a baseline rule that "[t]he Secretary [of DOE] shall not . . . transfer or sell any uranium (including natural uranium concentrates, natural uranium hexafluoride, or enriched uranium in any form) to any person" except as provided for in certain exceptions.  42 U.S.C. § 2297h-10.

31.     One exception to this overall prohibition allows sales under the following conditions:

> **(d) Inventory Sales**
> **(1)** . . . [T]he Secretary may, from time to time, sell natural and low-enriched uranium (including low-enriched uranium derived from highly enriched uranium) from the Department of Energy's stockpile.
> **(2)** . . . [N]o sale or transfer of natural or low-enriched uranium shall be made unless—
>> **(A)** the President determines that the material is not necessary for national security needs,
>> **(B)** the Secretary determines that the sale of the material will not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry, . . . and
>> **(C)** the price paid to the Secretary will not be less than the fair market value of the material.

42 U.S.C. § 2297h-(10)(d).

32.     A Determination under section 2297h-10(d)(2)(B) by the Secretary that the sale "will not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry" is only valid for two years.  Consolidated Appropriations Act of 2014, P.L. 113-76, Div. D, Tit. 3 § 306(a).  The Secretary must issue a new Determination if DOE engages in additional uranium transfers after a prior Determination expires.

33.     In 2008, DOE published an Excess Uranium Inventory Management Plan which provided that the DOE uranium "entering the market in any one year would generally represent no more than 10% of the total annual domestic fuel requirements of all licensed nuclear power plants . . . .  This amount should not have an adverse material impact on the domestic uranium mining, conversion, and enrichment industries."

34.     Appendix A to the 2008 Excess Inventory Management Plan contains the Secretary of Energy's Policy Statement on Management of the Department of Energy's Excess Uranium Inventory, dated March 11, 2008, which reiterated, as a general matter, DOE's intent to limit annual uranium transfers to less than 10% of the total annual requirements of licensed power plants.

Previous Determinations that Transfers of Uranium Would Not Have an
Adverse Material Impact on the Domestic Uranium Industry

35.     DOE contractors are conducting accelerated environmental cleanup work at government sites.  DOE contractors are also down-blending highly-enriched uranium to low-enriched uranium as part of other DOE programs.

36.     For the last few years, because of funding shortages, DOE has paid these contractors in uranium from its stockpiles, including UF6 and low-enriched uranium, instead of with money.  DOE refers to this as a "barter" transaction.

37.     These contractors have then sold the uranium received from DOE on the open market, or sold it to an intermediary which then sold the uranium on the open market.

38.     The Secretary previously issued Determinations in November 2009, March 2011, and May 2012 to facilitate the payments of uranium to the contractors.

39.     The 2009, 2011, and 2012 Determinations all claimed, per section 2297h-10(d)(2)(B), that the ongoing uranium transfers would not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industries.

40.     The Secretary's findings in those Determinations—that is, that the sales would not have a material adverse impact on the domestic uranium mining, conversion, or enrichment industries—were based on reports prepared by Energy Resources International, Inc. ("ERI"). DOE commissioned the ERI reports to analyze the expected impact of DOE uranium transfers on commercial markets and on individual segments of the United States' domestic uranium industry.

<u>The Report on Market Impact Underlying the November 2009 Determination</u>

41.     The November 2009 Determination was based on a report from ERI in November 2009 ("2009 ERI Report").

42.     The 2009 ERI Report found that the quantities of DOE's then-planned transfers of UF6 would represent 10% of the United States' annual market for UF6.

43.     The 2009 ERI Report found that DOE's then-planned transfers of UF6 would result in a $0.23/kgU (kilogram of uranium) decrease in the price for converting uranium into UF6 (the service sold by ConverDyn).

44.     According to the 2009 ERI Report, this price decrease would represent a 3.8% decrease in the "spot price" for UF6 conversion services and a 2.0% decrease in the "term price" for UF6 conversion services.

45.     The "spot price" (or "spot market price") refers to the price for uranium and related services which will be delivered within 12 months after the contract is signed. The "term price" (or "long-term price" or "term market price") refers to the price for uranium and related services which will be delivered more than one year after the contract is signed.

46.     The 2009 ERI report concluded that the DOE uranium transfers would not have a material adverse market impact, stating that

> ERI does not believe that either (i) the potential price effect of the presently proposed quantities of equivalent $U_3O_8$, conversion services and enrichment services that DOE is considering transferring during the next several years beginning in the fourth quarter of 2009; or (ii) the quantities of domestic production, if any, that might be displaced due to the proposed DOE transfers are of a magnitude that they would constitute a material adverse impact on the domestic industries or any of the initiatives that are presently underway.

47.     However, the 2009 ERI Report also concluded that

> Going forward, there may be little real industry concern regarding whether DOE transfers material in any single year that amounts to 8%, 10% or 12% of annual U.S. requirements, as long as on average it appears that an effort is being made by DOE to adhere to previously established guidelines. However, the transfer of material in amounts that are substantially larger than this is likely to be viewed by the industry as DOE establishing a precedent by which it may make future transfers without any regard for the "maintenance of a strong domestic nuclear industry."

> If the industry believes that such a precedent is being established, then ERI expects that domestic suppliers within each of these markets may become concerned that (i) previously proposed schedules of transfers would be accelerated at some time in the future, resulting in a larger amount of DOE inventory being introduced into the market each year and/or (ii) additional U.S. inventory that has not yet been identified as surplus would be added to the transfer schedule. Either of these could result in a larger amount of equivalent nuclear fuel materials and services

being introduced into the market, which, if of sufficient magnitude, could potentially have a material adverse effect on the markets.

### The Report on Market Impact Underlying the March 2011 Determination

48.     The March 2011 Determination was based on a report from ERI in December 2010 (the "2010 ERI Report").

49.     The 2010 ERI Report found that the quantities of DOE's then-planned transfers of UF6 would represent 10% of the United States' annual market for UF6.

50.     The 2010 ERI Report found that DOE's then-planned transfers of UF6 would result in a $0.20/kgU decrease in the price for converting uranium into UF6.

51.     This price decrease would represent a 1.6% decrease in the spot price for UF6 conversion services and a 1.3% decrease in the term price for UF6 conversion services.

52.     The 2010 ERI Report concluded that the DOE uranium transfers would not have a material adverse market impact, stating that

> Based on presently available information and the results of the analysis described in this report, ERI does not believe that either (i) the potential price effect of the presently proposed quantities of equivalent $U_3O_8$, conversion services and enrichment services that DOE is considering transferring during the next several years beginning in the first quarter of 2011; or (ii) the quantities of domestic production, if any, that might be displaced due to the proposed DOE transfers are of a magnitude that they would constitute a material adverse impact on the domestic industries or any of the initiatives that are presently underway.

53.     However, the 2010 ERI Report also concluded that

> The transfer by DOE of material during any year in an amount that is substantially larger than 10% of U.S. annual requirements is likely to be viewed by the industry as DOE establishing a precedent by which it may make future transfers without any regard for the "maintenance of a strong domestic nuclear industry."

> If the industry believes that such a precedent is being established, then ERI expects that domestic suppliers within each of these markets may become concerned that (i) previously proposed schedules of transfers

would be accelerated at some time in the future, resulting in a larger amount of DOE inventory being introduced into the market each year and/or (ii) additional U.S. inventory that has not yet been identified as surplus would be added to the transfer schedule.  Either of these could result in a larger amount of equivalent nuclear fuel materials and services being introduced into the market, which, if of sufficient magnitude, could potentially have a material adverse effect on the markets.

<u>The Report on Market Impact Underlying the May 2012 Determination</u>

54.　　The May 2012 Determination was based on a report from ERI in April 2012 (the "2012 ERI Report").

55.　　The 2012 ERI Report found that the quantities of DOE's then-planned transfers of UF6 would represent an average of 10.3% to 10.8% of the United States' annual market for UF6 over the next nine years.

56.　　The 2012 ERI Report found that DOE's then-planned transfers of UF6 would likely result in a $0.66/kgU to $0.69/kgU average decrease in the price for converting uranium into UF6 over the next nine years.

57.　　This price decrease would represent a 3.9% to 4.1% average decrease in the term price for UF6 conversion services over the next nine years.  The 2012 ERI Report did not calculate the percentage of average decrease in the spot price.

58.　　As a new calculation not done in prior years, ERI also evaluated the impact up through 2033, representing projected transfers for the next ~20 years.  The 2012 ERI Report found that over the ~20 year period the DOE's average share of domestic demand would be 4.8%, and that the price would drop an average of $0.30/kgU, a 1.8% decline.

59.　　As with the two earlier ERI Reports, the 2012 ERI Report concluded that the DOE uranium transfers would not have a material adverse market impact.

60.     The 2012 ERI Report also repeated the warning from earlier Reports concerning

transfers greater than 10% of U.S. annual requirements:

> Unless DOE can demonstrate to the domestic fuel supply industry that its
> transfer of material during any year(s) in an amount that is substantially
> larger than 10% of U.S. annual requirements will not establish a
> precedence by which DOE may make future transfers without any regard
> for the "maintenance of a strong domestic nuclear industry", then DOE
> actions may, in fact, have an adverse material impact on the domestic
> industry.

### Changes to DOE's Policy on Management of Its Excess Uranium Inventory

61.     In 2013, DOE revised its Excess Uranium Inventory Management Plan originally

issued in 2008.  Among other changes, DOE abandoned its prior policy of generally limiting

uranium transfers to no more than 10% of the United States' domestic uranium requirements:

> The 2008 Plan included reference to a Departmental guideline that, as a
> general matter, the Introduction into the domestic market of uranium from
> Departmental inventories in amounts that do not exceed 10 percent of the
> total annual fuel requirements of all nuclear power plants should not have
> an adverse material impact on the domestic uranium mining, conversion,
> or enrichment industry. . . .  Based on experience gained since issuance of
> the 2008 Plan, including in particular the market impact analysis that
> supported the May 15, 2012 Secretarial Determination (the May 2012
> Determination), the Department has determined that it can meet its
> statutory and policy objectives in regard to DOE uranium sales or transfers
> without an established guideline.  In addition, as discussed below,
> decisions to introduce uranium into the market pursuant to section 3112(d)
> must be reviewed every two years.  Accordingly, the 10 percent guideline
> will no longer be used.

(footnotes omitted).

62.     The new policy was issued without formal notice and without giving the public

the opportunity to comment.  The new policy also did not explain how DoE could have based

this determination on the 2012 ERI Report, as the 2012 ERI Report (like the reports before it)

stated that transfers greater than 10% may have an adverse market impact:

> Unless DOE can demonstrate to the domestic fuel supply industry that its transfer of material during any year(s) in an amount that is substantially larger than 10% of U.S. annual requirements will not establish a precedence by which DOE may make future transfers without any regard for the "maintenance of a strong domestic nuclear industry", then DOE actions may, in fact, have an adverse material impact on the domestic industry.

63.     Nor does the new policy explain how DOE's prior transfers—which were around 10%—gave it the "experience" to know that transfers *greater* than 10% would not have an adverse impact.

64.     To the extent DOE implies that it conducted internal analysis and evaluation on the market impact of abolishing the 10% policy, this contradicts statements DOE made to the Government Accountability Office regarding the ERI reports, in which DOE stated "that they contracted with ERI to provide subject matter expertise that did not exist within DOE and trusted ERI to provide that expertise."

65.     The new policy also did not indicate whether DOE evaluated how this policy change impacted members of the uranium industry who relied on the prior 10% limit in structuring their business plans or whether DoE considered input from members of the domestic uranium industry about the effects of the change.

### The Secretary Issued the Latest Determination in May 2014

66.     The Secretary issued the most recent Determination on May 15, 2014 (the "May 2014 Determination") in support of its ongoing plans to pay contractors with uranium, including UF6 and low-enriched uranium.

67.     Before issuance of the May 2014 Determination, ConverDyn employees met with DOE staff regarding the planned UF6 transfers.  At these meetings, ConverDyn informed DOE that proceeding with transfers would cause substantial harm to the domestic conversion industry.  ConverDyn proposed various compromises which could lessen the impact of the transfers.

68.     After the meeting with DOE, but before DOE issued the Determination, on March 10, 2014, ConverDyn sent two letters to DOE describing the harms the domestic conversion industry would incur if the Secretary proceeded with further transfers of UF6 and low-enriched uranium, as well as recommendations for the processes DOE should use in evaluating the adverse market impact of the transfers.

69.     On May 15, 2014, the Secretary proceeded to issue a Determination ostensibly finding that DOE sales or transfers would not have an adverse material impact on the domestic uranium, conversion, or enrichment industries.

<u>Unlike Prior ERI Reports, the 2014 ERI Report Did *Not* Conclude</u>
<u>That DOE's Transfers Would Not Have an Adverse Material Impact</u>

70.     The May 2014 Determination did not identify a rationale for the finding of no adverse material impact, though the DOE press release announcing the Determination stated that the Determination was, in part, "supported by an independent market analysis performed by [ERI]" in April 2014 (the "2014 ERI Report").

71.     The 2014 ERI report notes that "DOE requested that Energy Resources International (ERI) perform this new market impact study in support of the planned DOE process to fulfill" DOE's statutory obligation to issue a new Determination before making additional transfers. According to ERI, the report "presents the results of an updated business analysis performed by ERI of the potential impact on the commercial markets associated with the introduction of DOE excess uranium inventories in various forms and quantities."

72.     The 2014 ERI Report found that the quantities of DOE's planned transfers of UF6 would represent an average of 15% of the United States' annual requirements for UF6 over the next ten years—a fifty percent increase from the approximately 10% considered in prior ERI Reports.

73.     Regarding the percentage of the annual domestic requirements represented by the DOE transfers, the 2014 ERI Report stated that "the predictability of DOE's inventory transfers into the commercial markets over time is very important to the orderly functioning of the nuclear fuel markets."  ERI explained that, "[i]n this regard, it is critical for long-term planning and investment decisions by the domestic industry that there can be confidence that DOE will adhere to what it presents as being established guidelines and plans."

74.     The 2014 ERI Report also noted that DOE had recently abolished its prior guideline prohibiting the sale or transfer of more than 10% of domestic requirements.  ERI stated that "the decision by DOE to no longer have an established guideline that would limit DOE inventory transfers to 10% of U.S. requirements was interpreted by the U.S. industry and investment community as an indication that DOE will not act in a predictable manner regarding future inventory releases," such that "unless DOE can demonstrate to the domestic fuel supply industry that its transfer of material during any year(s) will remain predictable and that DOE will not make future transfers without any regard for the 'maintenance of a strong domestic nuclear industry', then DOE actions may, in fact, have an adverse material impact on the domestic industry."

75.     The 2014 ERI Report warned that, "[w]hile DOE has taken steps towards improved predictability since the release of the 2013 [Excess Uranium Inventory Management] Plan, it is not clear that this standard [has] been met - certainly not in the view of domestic industry."  (footnote omitted).

76.     The 2014 ERI Report found that, as of March 31, 2014, the spot price of conversion services was $7.50/kgU and the term price was $16.00/kgU.

77.     The 2014 ERI Report found that DOE's planned transfers of UF6 would likely result in a $0.90/kgU average decrease in the price for converting uranium into UF6 over the next ten years.

78.     This price decrease would represent an 11.8% decrease in the spot price for UF6 conversion services and a 5.5% decrease in the term price for UF6 conversion services.

79.     The 2014 ERI Report also evaluated other new metrics measuring the market impact of DOE's planned transfers of UF6 that it had not measured in prior reports.

80.     The 2014 ERI Report found that DOE's transfers of UF6 would result in a 7% to 8% loss in sales volume for the conversion services offered by ConverDyn.

81.     The 2014 ERI Report also found that, due to high fixed costs for production of UF6, the planned DOE transfers would cause a 6% to 8% increase in Metropolis Works' UF6 production costs.

82.     The 2014 ERI Report further found that employment at the Metropolis Works facility decreased by 20% (about 64 employees) between 2012 and 2013, and that "the decrease in work force was due to lower market demand, a portion of which was the result of the impact of DOE inventory on ConverDyn sales volume."

83.     With respect to anticipated transfers under the program until 2033, the report found that over the ~20 year period the DOE's average share of domestic demand would be 12% to 15%, and that the price would drop an average of $0.80/kgU, a 4.8% decline in price.  These figures, reflecting the long term adverse market impact, were *almost triple* those in the 2012 ERI Report.

84.     Given these findings, and unlike in prior years, the 2014 ERI Report did *not* conclude that the transfers would not have an adverse material market impact.

85.     The 2014 ERI Report instead stated:

> In the context of a much stronger price environment, the market impact study conducted by ERI two years ago judged, at that time, that the impacts of the DOE inventory releases were small enough so as to not constitute a material adverse impact. DOE and ERI sought to clarify ERI's role in the development of this market impact study. ERI's role is to analyze the impacts associated with the release of DOE inventories into the commercial markets for the period 2014 to 2033. In accordance with the USEC Privatization Act, any determination of "adverse material impact" is made by the Secretary of Energy. As such, this market impact assessment does not make any conclusion regarding whether or not the release of DOE inventories into the commercial markets will result in an adverse material impact.

86.     For comparison purposes, the following table contrasts the relevant findings from the different ERI Reports underlying the 2009, 2011, 2012, and 2014 Determinations:

|  | **2009 ERI Report** | **2010 ERI Report** | **2012 ERI Report** | **2014 ERI Report** |
|---|---|---|---|---|
| **DOE UF6 Inventory Transferred** | 10% of the U.S. market | 10% of the U.S. market | 10.3% to 10.8% of the U.S. market (average) | 15% of the U.S. market (average) |
| **Price Impact** | -$0.23/kgU | -$0.20/kgU | -$0.66 to -$0.69/kgU | -$0.90/kgU |
| **Spot Price Impact** | 3.8% decline | 1.6% decline | Unable to determine | 11.8% decline |
| **Term Price Impact** | 2.0% decline | 1.3% decline | 3.9% to 4.1% decline | 5.5% decline |
| **Sales Volume** | - | - | - | 7% to 8% decline |
| **Production Costs** | - | - | - | 6% to 8% increase |
| **Adverse Material Impact?** | No adverse material impact found | No adverse material impact found | No adverse material impact found | Did not find no adverse material impact |

87.     The following table also shows how the 2014 ERI Report found a much greater average long term market impact over the next 20 years than that found in the 2012 ERI Report:

|  | **2012 ERI Report** | **2014 ERI Report** | **Change Between Reports** |
|---|---|---|---|
| **Share of Demand Met by DOE UF6** | 4.8% of the U.S. market | 12% - 15% of the U.S. market | 281% greater share |
| **Price Impact** | -$0.30/kgU | -$0.80/kgU | 267% greater decline in price |
| **Spot Price Impact** | ERI was unable to determine | 10.2% decline | - |
| **Term Price Impact** | 1.8% decline | 4.8% decline | 267% greater decline in price |

DOE Decision to Transfer Uranium

88.     The Secretary is required to notify Congress at least 30 days before it carries out a transfer of uranium under 42 U.S.C. § 2297h-10(d)(2)(B).  Consolidated Appropriations Act of 2014, P.L. 113-76, Div. D, Tit. 3 § 306(b).

89.     On June 7, 2014, the Secretary notified Congress that DOE intends to make the first transfer under the May 2014 Determination.

90.     The notice states that DOE expects to transfer title to the first lot of uranium on July 15, 2014—though DOE could make the transfer as early as July 7, 2014 (30 days after the notice).

91.     The notice also describes subsequent lots of uranium that DOE expects to transfer on August 15, 2014, and September 15, 2014.

<u>Harms to ConverDyn from the Upcoming DOE Transfers</u>

92.     DOE's uranium transfers challenge the long-term viability of ConverDyn, Metropolis Works, and the remaining secure domestic supply of conversion for the U.S. industry.

93.     DOE's planned transfers must be considered in the current market context.

94.     The market for UF6 conversion is already in a fragile position due to, among other things, losses of sales in the wake of the Fukushima accident, which resulted in a near total loss of demand from Japan and Germany (two of the largest purchasers of UF6 conversion services) totaling about 15% of the *world* market.

95.     Additionally, recent and near-term closures of nuclear plants in the United States, which otherwise would have required UF6 conversion services, have reduced ConverDyn sales, as have competitive advances from other energy sources.

96.     DOE's planned transfers will result in an additional $40.5 million loss of income between 2014 and 2016 by displacing conversion sales and depressing the market price for conversion services.  The DOE transfers increase the conversion supply available to the market without any corresponding change in demand.

97.     Since many of Metropolis Works' production costs are fixed and would therefore not decrease proportionally with any reductions in production, increased production costs will also contribute to these losses.

98.     The availability of uranium transferred from DOE on the spot market also has caused greater reductions in the spot price for UF6 and UF6 conversion services as compared with their term prices.  As a result of the substantial price disparity favoring spot market purchases over term market purchases, many customers who historically only purchased

conversion services from ConverDyn on the term market are now purchasing material on the spot market.

99.     These changed customer practices reduce ConverDyn's sales of conversion services, as well as the price it receives for remaining sales, and are expected to cause a $29 million reduction in revenue between 2014 and 2016.

The Government Accountability Office Finds that DOE Committed<br>Multiple Legal and Rule Violations as Part of Its Uranium Transfers

100.     The Government Accountability Office ("GAO") is an independent, nonpartisan agency that works for Congress to investigate, among other things, how and whether executive agencies comply with acts of Congress.

101.     In September 2011 and again in May 2014, GAO released reports itemizing the multiple ways in which DOE erred, and in some cases violated laws and rules, in carrying out uranium transfers (the "GAO Investigations").

102.     With regard to the market impact analysis component of transfers involving UF6 as well as other uranium compounds, the GAO Investigations found that:

(a)     DOE did not assess the technical quality of the ERI Reports underlying the determinations on market impact;

(b)     DOE did not request additional information from ERI to address gaps or missing critical information in the ERI Reports, such as in methodology, data sources, and assumptions;

(c)     DOE did not seek peer review of the ERI Reports when it lacked the internal subject matter expertise to review the reports, as required by information quality guidelines;

(d)     DOE accepted the ERI Reports even though the reports were missing information required by DOE information quality guidelines;

(e)     DOE relied on Determinations based on outdated information in authorizing uranium transfers;

20

(f)     DOE released uranium into the market prior to when such releases were
        scheduled to take place under its guidelines;

(g)     DOE abandoned a guideline limiting uranium transfers to no more than
        10% of the market for domestic uranium requirements without industry
        input and no clear basis for doing so;

(h)     DOE did not seek input for members of the uranium industry in creating
        its current uranium transfers management plan;

(i)     DOE's new uranium transfers management plan does not provide
        sufficient transparency and predictability as to how DOE will conduct
        uranium transfers; and

(j)     DOE did not account for all factors which would affect market prices.

103.    With respect to DOE's reliance on ERI and its failure to do its own analysis, DOE

said "that they contracted with ERI to provide subject matter expertise that did not exist within

DOE and trusted ERI to provide that expertise."

104.    The GAO Investigations also found problems with other aspects of the uranium

transfers, including legal and rule violations:

(a)     DOE undervalued uranium materials which it transferred or did not seek a
        fair price for the materials;

(b)     DOE did not account for the market impact of certain transfers; and

(c)     DOE violated federal fiscal laws by not depositing money it received from
        transfers into the Treasury, which circumvents Congress' appropriation
        powers.

105.    Congress, in the conference report for the Consolidated Appropriations Act of

2012, further stated that:

> The conferees are aware that the Department has yet to alter the
> contractual mechanism by which it has been transferring uranium to a
> contractor in exchange for additional cleanup services at Portsmouth in
> order to correct the violations of federal law cited in the [September 2011
> GAO] report.  This type of arrangement continues to be off-budget and
> inappropriately bypasses the congressional appropriations process.  There
> is also considerable concern that the increasing amount of uranium being
> transferred could destabilize the uranium market and thereby adversely
> impact our domestic uranium mining industry.

<u>DOE is Not Authorized to Sell Conversion or Enrichment Services</u>

106.    Beyond the USEC Privatization Act's limit on transfers based on market impact, the Act also limits DOE's sales to "natural and low-enriched uranium."  42 U.S.C. § § 2297h-10(d)(1).

107.    The value of UF6 has two components: the physical uranium component and the conversion services component.  Each component has a separate market value that can be sold and transferred independently of the other.

108.    The value of low-enriched uranium has three components: the physical uranium component, the conversion services component, and the enrichment services component.  Each component has a separate market value that can be sold and transferred independently of the other.

109.    DOE is authorized only to sell physical uranium (natural and low-enriched).

110.    DOE is not authorized to sell conversion services or enrichment services.

<u>DOE Sells UF6 and Low-Enriched Uranium Below Its Fair Market Value</u>

111.    The USEC Privatization Act also requires that, for any transfers, "the price paid to the Secretary will not be less than the fair market value of the material."  42 U.S.C. § § 2297h-10(d)(2)(C).

112.    Upon information and belief, DOE values the UF6 and low-enriched uranium transferred as payments to contractors at the spot market price, such that the DOE's assigned monetary value of the payments is equal to the *lowest available price* for that quantity of uranium.

113.    When, as now, the spot price for UF6 is historically depressed as compared to the term price, any valuations based on the spot price alone results in DOE receiving less than fair market value for UF6.

114.    The same dynamic applies to transfers of low-enriched uranium valued at the spot market price.

115.    According to the 2014 ERI Report, as of March 31, 2014, the spot price of conversion services was $7.50/kgU and the term price was $16.00/kgU.

116.    Likewise, the current price for fully converted UF6 is $81/kgU on the spot market and $133.58/ kgU on the term market.

117.    If DOE sells 2055 metric tons of UF6 per year (the amount authorized under the May 2014 Determination), it would receive $166 million per year at the current spot price versus $275 million per year at the current term price.  This is a difference of $109 million per year.

## CLAIMS

COUNT I (Violations of the USEC Privatization Act and Administrative Procedure Act)

118.    ConverDyn realleges and incorporates by reference each of the above paragraphs.

119.    DOE intends to make the first of many uranium transfers under the May 2014 Determination on July 15, 2014.

120.    DOE's planned transfers are not in accordance with the USEC Privatization Act and are in violation of the Administrative Procedure Act ("APA") (5 U.S.C. § 706).

121.    The USEC Privatization Act prohibits DOE from transferring uranium from its inventories unless certain specific conditions are met.

122.    The USEC Privatization Act permits DOE to make transfers on the condition that the Secretary has determined that the transfer will not have an "adverse material impact on the

domestic uranium mining, conversion, or enrichment industry."   The Secretary's May 2014 Determination is arbitrary, capricious, and unlawful.   Contrary to the Secretary's May 2014 Determination, DOE's transfers will reduce sales of conversion services, suppress prices for conversion services, cause higher production costs for conversion services, and drive detrimental changes in customer practices.   ConverDyn will suffer millions of dollars in harms if DOE proceeds with its planned transfers.   DOE's planned transfers are unlawful because they are based on an invalid determination of no adverse material market impact, and indeed will cause an adverse material market impact.

123.   DOE's planned transfers of UF6 further violate the USEC Privatization Act because DOE is not authorized to transfer the conversion or enrichment services component of UF6, only the "natural uranium" or "low enriched uranium" component.

124.   DOE's planned transfers also violate the USEC Privatization Act because DOE must receive fair market value for the material.   DOE values the material at a price that is below fair market value.   DOE therefore will not receive fair market value for the transferred UF6 or low-enriched uranium.

125.   DOE's transfers have caused and will cause irreparable harm to ConverDyn for which it has no adequate remedy at law.   In particular, DOE's past and continuing transfers, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.   ConverDyn will continue to suffer substantial irreparable injury to its goodwill, rights, and business unless and until DOE is enjoined from continuing their wrongful acts as requested in this Complaint.   The injury to ConverDyn from the transfers will be significant, and is not fully compensable, if compensable at all, by money damages.

COUNT II (Violation of Administrative Procedure Act)

126.    ConverDyn realleges and incorporates by reference each of the above paragraphs.

127.    The USEC Privatization Act requires the Secretary, as a necessary precondition to uranium transfers, to make a determination that the uranium transfers will not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry.

128.    The Secretary's May 15, 2014 Determination is arbitrary and capricious, and otherwise not in accordance with law, in violation of the Administrative Procedure Act (5 U.S.C. § 706).  The Determination was not based on sufficient evidence, ignored and was contrary to evidence in the administrative record on the market impact of the transfers, was not supported by adequate reasoning or explanation, and did not consider or ignored comments from members of the uranium industry who would be impacted by the transfers planned under the Determination. The Secretary fundamentally failed to provide a rational explanation for his determination that the planned transfers would not have an adverse material impact on the domestic conversion industry.

129.    The Secretary's May 15, 2014 Determination violates the USEC Privatization Act, contrary to the APA, and therefore cannot provide a basis for justifying DOE's planned uranium transfers.

130.    DOE's transfers have caused and will cause irreparable harm to ConverDyn for which it has no adequate remedy at law.  In particular, DOE's past and continuing transfers, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  ConverDyn will continue to suffer substantial irreparable injury to its goodwill, rights, and businesses unless and until DOE is enjoined from continuing

their wrongful acts as requested in this Complaint.  The injury to ConverDyn from the transfers

will be significant, and is not fully compensable, if compensable at all, by money damages.

COUNT III (Violation of the Administrative Procedure Act)

131.    ConverDyn realleges and incorporates by reference each of the above paragraphs.

132.    In 2008, DOE released its Excess Uranium Inventory Management Plan and an

accompanying policy statement, both of which stated that DOE would generally not release

uranium constituting more than 10% of the United States annual domestic nuclear fuel

requirements because this amount would not have an adverse material impact on the domestic

uranium industry.

133.    In 2013, DOE release a new Excess Uranium Inventory Management Plan which

removed the 10% limit on transfers, stating that it did so based on experience with prior transfers

and the 2012 ERI Report.

134.    This change to DOE's 2013 Excess Uranium Inventory Management Plan is

arbitrary and capricious, and otherwise not in accordance with law, in violation of the

Administrative Procedure Act (5 U.S.C. § 706).  The change was issued without formal notice

and without giving the public the opportunity to comment.  The change also is contrary to its

stated reasons, as the prior transfers, which were around 10%, did not give DOE experience with

transfers greater than 10%, and the 2012 ERI Report expressly stated that transfers greater than

10% may have an adverse market impact.  This asserted reason is further contrary to DOE's

statements to GAO that it did not have the internal subject matter expertise to conduct the type of

uranium market analysis provided by ERI.

135.    The new policy also did not indicate that DOE evaluated how this policy change

impacted members of the uranium industry who relied on the prior 10% limit in structuring their

26

business plans or whether DoE considered input from members of the domestic uranium industry about the effects of the change.

136.    DOE's adoption of the 2013 Excess Uranium Inventory Management Plan and its change to prior policy supporting the 10% limit on transfers was unsupported and was done in violation of the APA.

137.    On or around July 15, 2014, DOE will begin transfers of uranium which are expected to account overall for about 15% of the total annual market for domestic conversion services.

138.    DOE's transfers pursuant to its improperly adopted new policy which abolished the 10% cap on transfers will cause irreparable harm to ConverDyn for which it has no adequate remedy at law.  In particular, DOE's transfers, as alleged above, are causing irreparable harm, continuing to the foreseeable future, and are a serious and unmitigated hardship.  ConverDyn will continue to suffer substantial irreparable injury to its goodwill, rights, and businesses unless and until DOE is enjoined from continuing their wrongful acts as requested in this Complaint. The injury to ConverDyn from the transfers will be significant, and is not fully compensable, if compensable at all, by money damages.

## PRAYER FOR RELIEF

WHEREFORE, ConverDyn requests that the Court enter a judgment and decree:

A.    Declaring that the Secretary's May 2014 Determination violates both the USEC Privatization Act and the APA;

B.    Declaring that the Secretary's May 2014 Determination was arbitrary, capricious, and not in accordance with the law because (1) the evidence in the administrative record, including from DOE's own expert ERI, shows that the Secretary's

transfers outlined in the May 2014 Determination will "have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry," and (2) the Secretary failed to provide adequate explanation or reasoning for his determination that the transfers outlined in the May 2014 Determination will not "have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry";

C.      Declaring that the transfers of UF6 described in the Secretary's May 15, 2014 Determination are invalid because UF6 is not "natural" or "low-enriched uranium";

D.      Declaring that the transfers of UF6 uranium described in the Secretary's May 2014 Determination are invalid because the consideration received by the Secretary for the material is "less than the fair market value of the material";

E.      Declaring that the Secretary's May 2014 Determination is invalid because the Secretary did not adequately consider comments from those affected by the transfers;

F.      Declaring that the 2013 Excess Uranium Inventory Management Plan's elimination of the policy that DOE would limit uranium transfers to 10% of the annual domestic nuclear fuel requirement was arbitrary, capricious, and not in accordance with the law because it was (1) issued without formal notice and without giving the public the opportunity to comment, (2) contrary to the given reasons, (3) was not supported by adequate explanation, (4) was not supported by evidence in the administrative record, including from DOE's own expert ERI, (5) DOE lacked the internal subject matter expertise to make the policy change, (6) the policy did not take into account its adverse impact on the market or the domestic nuclear industry, and (7) the new policy did not take into account its impact on members of the United States' domestic uranium industry

who had relied on the prior policy in structuring their business, and (8) did not consider input from the affected members for the domestic uranium industry;

G.      Ordering that the May 2014 Determination is invalid and of no effect;

H.      Ordering that the change in policy to eliminate the 10% limit on transfers in the 2008 Excess Uranium Inventory Management Plan and its accompanying policy statement is invalid and of no effect;

I.      Preliminarily and permanently enjoining the Secretary from proceeding with the transfers described in the May 2014 Determination;

J.      Awarding ConverDyn's allowed costs and attorneys' fees; and

K.      Granting such other relief as the Court deems just and appropriate.

Dated:  June 13, 2014

Respectfully submitted,

By: /s/ Gordon A. Coffee

Gordon A. Coffee* #384613
gcoffee@winston.com
Brian M. Serafin #996019
bserafin@winston.com
Darani Reddick #492365
dreddick@winston.com
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000

Tyson R. Smith #495096
trsmith@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000

* Counsel of Record

Attorneys for Plaintiff ConverDyn