# EXHIBIT C

**ConverDyn v. Moniz**
**Case No. 1:14-cv-1012-RBW**

**Exhibit to Plaintiff ConverDyn's Motion for a Preliminary Injunction**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CONVERDYN** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )    **Case No. 1:14-cv-1012-RBW** |
| | ) |
| **ERNEST J. MONIZ, in his official capacity as** | ) |
| **Secretary of the United States Department of Energy,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF ENERGY** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DECLARATION OF MALCOLM CRITCHLEY

I, Malcolm Critchley, do hereby declare as follows based on personal knowledge and belief:

1.     I am the President and Chief Executive Officer of ConverDyn. I have been employed by ConverDyn for six years, since 2008. I have over 30 years of engineering and commercial experience in the nuclear fuel industry. Prior to joining ConverDyn, I was Head of Purchasing and Sales for Uranium Asset Management Ltd., where I was responsible for purchasing nuclear fuel for the British Energy fleet of reactors in the United Kingdom and providing uranium to fuel fabrication facilities in the U.S., Sweden, and the U.K.

2.     ConverDyn is the exclusive agent for "conversion" sales from Honeywell's Metropolis Works (MTW) facility in Metropolis, Illinois. ConverDyn is the only supplier of conversion services located in the U.S., and one of four primary suppliers of uranium conversion

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

services worldwide.   ConverDyn supplies approximately 25% of domestic conversion requirements.

3.     "Conversion" is the chemical process of converting uranium oxide ($U_3O_8$ or "yellowcake"), a solid, into uranium hexafluoride (UF6), a gas.  Conversion is a relatively small component—less than five percent—of the cost of nuclear fuel, but it is a critical component of the nuclear "fuel cycle."

4.     The fuel cycle starts with uranium ore.  After uranium is mined and milled, the resulting uranium oxide is sent to a conversion facility where it is converted into UF6 gas.  The UF6 is then sent to an enrichment plant where the material is "enriched" by concentrating the isotope uranium-235 ($U^{235}$).  From the enrichment plant, the enriched UF6 is sent to a fuel fabrication facility where it is made into nuclear fuel.

5.     Each step in the fuel cycle has a different character, different participants, different regional distribution, and a different value.  For example, most of the world's nuclear fuel cycle participants are foreign-owned even though the U.S. is the world's largest user of nuclear fuel, with one hundred operating nuclear units.

6.     Congress and the Department of Energy (DOE) have both recognized the importance of maintaining a strong domestic conversion industry, which, at present, is limited to ConverDyn/MTW.  Maintaining an integrated domestic supply source to meet U.S. utility nuclear fuel requirements is crucial to national energy security and independence.  Maintaining a strong domestic conversion industry also avoids over reliance on foreign sources of nuclear fuel, helps to maintain fair pricing by foreign suppliers, and increases assurance (and diversity) of supply.

7.     The domestic conversion industry also provides services critical to our national security and defense capabilities. For legal and policy reasons, the production of tritium, which is critical to the readiness of U.S. nuclear weapons, must be entirely of U.S. origin and produced entirely in U.S. facilities. The U.S. government contracts with a domestic nuclear power operator to produce tritium as a byproduct of commercial power generation. If MTW were to cease operation, then the U.S. would no longer have domestic conversion capability and would therefore be unable to fabricate new "U.S. only" fuel.

8.     DOE manages an enormous inventory of uranium that was derived historically from defense-related activities, U.S. foreign policy initiatives around nuclear security in Russia, and DOE's past uranium enrichment operations. DOE has publicly identified a significant share of that inventory that is in excess of the country's national defense and energy security needs. DOE's excess inventory is partially stored as UF6 at DOE sites in Ohio and Kentucky, or as low-enriched uranium, also in UF6.

9.     DOE currently uses private contractors to perform environmental cleanup work at nuclear sites. DOE has not been appropriated funds by Congress to pay for these contractors' services. DOE therefore compensates these contractors by giving them uranium from its inventories in lieu of monetary payments. DOE calls these "barter" transactions.

10.     In order to monetize the uranium, the contractors, or an intermediary, sell the uranium on the open market in direct competition with ConverDyn. This uranium transferred from the U.S. government to the private marketplace artificially lowers the market price for conversion services to the immediate and ongoing detriment of the domestic conversion industry.

11.     Private sector firms, like ConverDyn, must continually make business decisions in order to compete in a changing market environment. And, the domestic conversion industry,

given a level playing field, can compete economically with other international suppliers. But, ConverDyn cannot effectively compete in the marketplace against DOE, which has an inventory of essentially "no cost" uranium that it intends to transfer over the next 20 years. And, in 2013, DOE eliminated the one measure of predictability surrounding its transfers when it abandoned its policy—without any input from the domestic uranium industry—that "capped" annual transfers at 10% of domestic requirements. This limit, while certainly not protective of the domestic conversion industry in light of the current fragile state of the market following Fukushima and other plant closures in the U.S., nonetheless added a measure or predictability and transparency with respect to DOE's long-term plans.

12.    ConverDyn took the 10% limit into account when entering into contracts with its customers. For example, the predictability of the 10% limit helped maintain prices for conversion services and provided a baseline against which ConverDyn could forecast future market conditions. Abolishing the 10% limit greatly increases market uncertainty and increases ConverDyn's business risk, since the price and overall supply is subject to DOE's whims. Further, DOE transferring large quantities of uranium into the market, or a lack of predictability as to how much uranium DOE will transfer into the market, may also impact willingness to make additional capital investments in the MTW conversion facility.

13.    The long-term viability of ConverDyn, MTW, and the remaining secure domestic supply of conversion for the U.S. industry, is challenged by DOE's planned uranium transfers. DOE's planned annual transfers constitute 15% of the U.S. market. This is a fifty percent increase in DOE's market share since 2010. DOE's annual transfers are the equivalent of 2-3 months of output from MTW per year.

4

14.     DOE inventories of conversion services have no current cost basis. Uranium conversion services contained in the UF6 were acquired by the U.S. government over the past half-century as strategic and working inventories. Primary converters such as ConverDyn, which have current costs for labor, chemicals and electricity, cannot compete with this supply. DOE's old inventories are valued at spot market price and there is no loss to the government to be incurred or reported no matter how low the price goes.

15.     The continued erosion of ConverDyn sales due to this aggressive government competition is directly contrary to maintenance of a strong domestic conversion capability. Any additional transfers by DOE, much less the total quantity authorized by the 2014 Secretarial Determination, will have immediate and cumulative adverse material impacts on the domestic conversion industry.     These impacts include lost sales, increased production costs, price suppression, and changed customer practices, and result in an approximately $40 million loss of profits between 2014 and 2016, as ConverDyn explained in a letter to DOE prior to issuance of the May 2014 Secretarial Determination..

16.     Lost Sales.  DOE intends to make annual transfers of UF6 that are equal to approximately 15% of U.S. conversion demand. To date, and to the best of my knowledge, the majority of DOE sales have been made to U.S. customers, and this situation is likely to continue for future sales. Because ConverDyn has the highest share of demand in the U.S. (approximately 25%), domestic sales of excess DOE uranium have a disproportionally greater impact on ConverDyn than on foreign providers of conversion services.

17.     A proper Secretarial Determination should account for current market conditions—that is, the market into which DOE transfers will be made. Since the May 2012 Secretarial Determination, there has been a substantial loss of demand for conversion services in

Japan and Germany following the accident at the Fukushima power plant in Japan. The market impact from Fukushima has lasted longer and has been larger than anticipated by economic experts (including by DOE and its consultant). All 54 reactors in Japan are currently shut down, and it is highly uncertain how many will eventually restart and, if so, when. Combined, the plant shutdowns in Japan and Germany have resulted in an approximately 15% reduction in demand.

18.     In addition, four U.S. reactors have been permanently shut down since the last Secretarial Determination, with a fifth reactor scheduled for closure by the end of 2014. Collectively, the five reactors represent nearly 4% of annual U.S. demand for conversion services.

19.     The decline in demand for nuclear fuel has had a significant impact on the nuclear fuel supply chain and, in particular, on ConverDyn's booked and projected sales. Any further transfers of conversion services by DOE into this extremely fragile market will exacerbate the harm to ConverDyn.

20.     DOE transfers under the May 2014 Secretarial Determination will reduce ConverDyn's profits by more than $10 million per year and may cause a shift from a profit to a loss in one of the next few years, as ConverDyn explained to DOE in a letter prior to issuance of the May 2014 Secretarial Determination. These impacts are supported by DOE's own experts. According to a market analysis prepared by DOE's contractor, Energy Resources International (ERI), in advance of the Determination,[1] DOE transfers will cause ConverDyn sales to decrease between 7 and 8%.

---

[1]     Energy Resources International, Inc., *2014 Review of the Potential Impact of DOE Excess Uranium Inventory on the Commercial Markets*, ERI-2142.17 -1401 (April 25, 2014) ("2014 ERI Report") (Exhibit B). ConverDyn is in general agreement with the 2014 ERI Report's assessment of the magnitude of adverse impacts from DOE transfers on the domestic conversion industry.

21.     Production Costs.   For the period covered by the May 2014 Secretarial
Determination, MTW has capacity to provide conversion services beyond the volumes sold by
DOE.   The reduction in production volume caused by DOE sales will therefore increase
production costs on a per kilogram uranium (kgU) basis.  This is because MTW operates with a
high ratio of fixed to variable costs, which makes profitability particularly sensitive to volume
reductions.  Operating costs do not vary significantly, regardless of the amount of production
volume.  As a result, lower sales volumes lead directly to higher costs of production (per kgU).
This results in measurably lower profits—or, in some years, larger losses—when production
declines.

22.     DOE's expert consultant, ERI, concluded in its 2014 Report that DOE transfers
over the period covered by the May 2014 Secretarial Determination will cause production costs
to increase between 6 and 8%.

23.     Price Suppression.  DOE transfers also have an immediate and cumulative impact
on the price of conversion services.  DOE transfers result in a large increase in secondary supply,
which drives the price of conversion lower.  Perversely, in order for DOE to continue to receive
the same revenue from uranium transfers in the face of declining prices, DOE must transfer
greater amounts of material.  But, the transfers cause the price to decline, thereby necessitating
even larger transfers to maintain the same revenue.  The market dynamics created by the
government competitor in the market place have significant and ongoing adverse impacts on
ConverDyn.

24.     These adverse impacts were quantified by DOE's contractor, ERI, in its 2014
Report.  According to the 2014 ERI Report, DOE transfers will cause the price of conversion to
decline by approximately $1/kgU over the period 2014-2016.  This represents a *five-fold*

*increase* in the adverse price impact of DOE transfers since 2010. The 2010 ERI report predicted that DOE transfers would cause conversion prices to decline by only $0.20/kgU.

25. According to the 2014 ERI Report, DOE transfers will cause a 12% decline in the conversion *spot* price. In contrast, in 2010, ERI projected DOE transfers to cause a 1.6% decline in the spot price for conversion services. DOE's own experts therefore predict a price impact that is nearly *8 times greater* than that projected in 2010.

26. In 2010, ERI projected DOE transfers would cause a 1.3% decline in the conversion *term* price. In 2014, ERI projected that DOE transfers will cause a 6% decline in the term price. DOE's experts therefore now predict a price impact that is nearly *five times greater* than that projected in 2010.

27. Change in Customer Practices. DOE uranium transfers have other indirect effects on ConverDyn. The availability of DOE UF6 in the spot market and the resultant disparity between the spot and term prices for conversion have caused changes in the purchase practices of ConverDyn customers that reduce ConverDyn's sales and revenue. Customers who historically contracted exclusively in the term market for conversion supply are now issuing Requests for Proposals for purchase of conversion and/or conversion-containing product in the spot market.

28. Existing ConverDyn customers that have contractual volume flexibilities originally intended to accommodate changes in operational requirements are now electing minimum volumes in order to purchase the balance of their requirements in the depressed spot market. This trend is expected to continue and is likely to become more prevalent the longer that there is such a large arbitrage opportunity between spot and term prices created by DOE transfers. These changes in customer practice have the potential to cause an additional $29

8

million in lost revenue between 2014 and 2016, as ConverDyn explained to DOE in a letter prior to issuance of the May 2014 Secretarial Determination.

29.   Failure to Obtain Fair Market Value.  DOE receives value for its UF6 based on the spot price.  There is currently a large disparity between the spot and term prices for UF6—the term price is significantly higher than the spot price.  At current prices, valuations of DOE material made at term prices, or even a mix of term and spot prices, would have resulted in substantially more revenue to DOE.  DOE therefore failed to obtain fair market value for the transferred UF6.

30.   The current price for fully converted UF6 is $81/kgU on the spot market and $133.58/kgU on the term market.  If DOE sells 2055 metric tons of UF6 per year (the amount authorized under the May 2014 Determination), it would receive $166 million per year at the current spot price versus $275 million per year at the current term price. This is a difference of $109 million per year.

31.   Based on the data in the June 7, 2014 notice, DOE is receiving $1566/kgU for the low enriched uranium, totaling $36.6 million for the three transfers.  The term current term market price for enriched uranium product is $1982/kgU, which would result in DOE realizing $46.3 million at the term price—a difference of nearly $10 million for these three transfers alone.

32.   Uranium products, including natural and low-enriched UF6, are valued based on the cost of the different components that make up the product.  Those components include the cost of converting uranium oxide into UF6 gas (conversion) and the cost of enriching uranium to concentrate the key isotope (enrichment).  The value of "natural" (*i.e.*, unenriched) UF6 therefore has two components: the natural uranium and conversion.  The value of low-enriched UF6 has three components: the low-enriched uranium, conversion, and enrichment.  Each

component has a separate market value that can be sold and transferred independently of the others.

33.     ConverDyn has repeatedly expressed its concerns to DOE regarding the substantial impacts of DOE transfers on the domestic conversion industry — both on its own and through a trade group, the Uranium Producers of America (UPA). In advance of the May 2014 Secretarial Determination, ConverDyn also met with officials from the DOE to explain the impacts of additional uranium transfers on ConverDyn. Subsequently, on March 10, 2014, I submitted, on behalf of ConverDyn, two documents to DOE for consideration in making the May 2014 Secretarial Determination.

34.     The first document I submitted to DOE is a set of principles for use in evaluating impacts on the domestic conversion industry.[2] The letter highlighted shortcomings in prior determinations that must be remedied in order to adequately assess the adverse impacts on the domestic conversion industry. ConverDyn explained that DOE had not, in the past, solicited data or input from ConverDyn on the impacts of DOE transfers — a significant oversight in light of the fact that ConverDyn is the only domestic provider of conversion. ConverDyn also urged DOE to validate the model used by ERI against historic transactions, price movement, and the predictions made in previous assessments, which underestimated the impacts of DOE transfers. ConverDyn also provided details on current market conditions and pointed out that past DOE transfers have not resulted in the government obtaining fair market value.

---

[2]     *See* Letter to Dr. P. Lyons, Assistant Secretary for Nuclear Energy, DOE, from M. Critchley, CEO, ConverDyn, "Guiding Principles for Secretarial Determination Process," dated March 10, 2014 (Exhibit O).

35.    The second document I submitted to DOE was a detailed proprietary assessment of the impacts of future DOE transfers on ConverDyn.[3] The assessment describes the various mechanisms through which DOE transfers harm the domestic conversion industry and identifies, by category, the losses that will result from DOE transfers. The effects of DOE transfers— described in ConverDyn's damage assessment and backed up by DOE's own economic analysis—are amplified by the weakened post-Fukushima nuclear fuel market and recent U.S. reactor closures.

36.    The ongoing and threatened harm to ConverDyn from DOE excess uranium transfers is irreversible. ConverDyn's losses cannot be made up for in later years. Once the DOE material is transferred for sale in the commercial market, DOE cannot demand its return. The market supply is forever increased. Any DOE transfer will therefore permanently suppress the price of conversion services.

37.    Because the conversion market relies on long-term contracts that are typically linked, at least in part, to market prices at the time of the contract, the effect of DOE transfers on market prices also has an ongoing adverse impact, by reducing ConverDyn revenues throughout the term of its contracts.

38.    I am not aware of any ability for ConverDyn to recover damages from the government.

39.    On June 7, 2014, the Secretary notified the House and Senate Committees on Appropriations of its upcoming transfers of uranium to be made during the third quarter of calendar year 2014 (July through September). The first transfer was scheduled to take place on

---

[3]    *See* Letter to Dr. P. Lyons, Assistant Secretary for Nuclear Energy, DOE, from M. Critchley, CEO, ConverDyn, dated March 10, 2014 and the attached report, *Adverse*

July 15, 2014, though DOE agreed, following discussions among ConverDyn and DOE counsel, to suspend the transfer until July 31. DOE action is therefore imminent and, as described above, would have immediate and ongoing adverse impacts on ConverDyn.

40.     I have also read the Complaint filed in the above-captioned case on June 13, 2014 and verify that the factual statements in the Complaint are true and correct to the best of my knowledge and belief.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 23rd day of June 2014.

Malcolm Critchley
President and CEO
ConverDyn

---

*Material Impacts of Department of Energy Sales of Excess Uranium on Domestic Conversion Industry* (Exhibit P).

SF:374882.5

12