# EXHIBIT O

**ConverDyn v. Moniz**
**Case No. 1:14-cv-1012-RBW**

**Exhibit to Plaintiff ConverDyn's Motion for a Preliminary Injunction**

 **CONVERDYN**

March 10, 2014

Dr. Peter B. Lyons
Assistant Secretary for Nuclear Energy
U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Dear Dr. Lyons,

As discussed in recent meetings between Honeywell International, Inc. (Honeywell) and the
Department of Energy (DOE), DOE sales and transfers of excess uranium (mainly in the form of
UF6) have materially damaged the domestic uranium conversion industry. Moreover, market
developments since the 2012 Secretarial Determination have exacerbated the adverse impacts on
the industry. Thus, in advance of the 2014 Secretary Determination regarding further excess
uranium sales, Honeywell offers the following observations and recommendations for inclusion
and consideration in DOE's biennial review.

## Guiding Principles for Secretarial Determination Process

Honeywell encourages DOE to adopt the following principles when making future Secretarial
Determinations regarding sales of excess uranium. These principles establish much-needed,
realistic parameters for the economic analysis underlying the Secretarial Determination. They
also provide for the controlled sharing of necessary industry data to support the economic
assessment of the impacts on the domestic conversion industry from DOE uranium sales. As
evidenced from past Secretarial Determinations that incorrectly found no adverse material
impact to the domestic conversion industry from DOE uranium sales, developing a solid
economic analysis is crucial to reaching a fair and accurate conclusion regarding the impacts of
those sales. These principles will enable DOE to develop a sound record supporting a rational
and well-articulated Secretarial Determination.

## Engage with Industry on Assumptions and Inputs

Industry engagement is essential to producing a robust analysis that reflects actual market
conditions. Such assessment of adverse material impacts will require DOE to examine
commercial information from the domestic conversion industry. In order to facilitate the
gathering of this information as part of the Secretarial Determination process, DOE should
provide Honeywell with a list of data necessary to complete a full economic assessment.
Honeywell is committed to providing DOE with timely and accurate information — including
confidential financial information — to ensure that the underlying economic analysis reflects the
true impacts on the domestic conversion industry. ConverDyn would also welcome the
opportunity to perform an advance review and provide feedback on the draft impact assessment
before it is released.

Because much of the commercial information provided to DOE would be considered confidential
financial information that could damage the information's owner should it be disseminated

beyond DOE, the information would be exempt from public disclosure under 10 C.F.R. § 1004.10(b)(4).   Should DOE wish to disclose any of Honeywell's confidential financial information to its agent or sub-contractor, DOE must establish procedures to ensure that only information necessary to conduct the analysis is provided, and DOE must protect the information from further release.

## Consider all Factors that Contribute to an Adverse Material Impact

Adverse material impacts may occur in several different ways.  DOE should consider all of the mechanisms through which its excess uranium sales could damage the domestic conversion industry.  It would be inappropriate to arbitrarily exclude certain types of impacts simply because DOE considers them difficult to assess.[1]  Therefore, in advance of conducting the market impact associated with DOE excess uranium sales, DOE should identify the ways in which an "adverse material impact" for each segment of the domestic nuclear industry may occur, including:

- Price suppression
- Displaced sales
- Impact on investment and long term viability
- Impact on jobs
- Impact on profitability
- Impact on share price and investor sentiment
- Impact on exploration projects and investment plans

In addition, any assessment of damage must take into account the actual financial position of the companies affected by DOE excess uranium sales.

## Ensure Fair Market Value for DOE Sales

Past Secretarial Determinations have inadequately considered the statutory requirement in Section 3112(d)(2) of the USEC Privatization Act that DOE obtain fair market value for the material.  A simple comparison of the price achieved by DOE and the prevailing market spot price fails to ensure that DOE is receiving fair market value because the presence of DOE sales depresses the same indicators used by DOE to determine fair market value and because DOE does not account for the differences in spot and term prices.  To rectify this deficiency going forward, DOE should explicitly consider the following factors when assessing fair market value:

- Sales price compared to the average cost of production of the domestic uranium mining, conversion, and enrichment industries
- Sales price compared to the prevailing market at the time of a sale
- Sales price taking into account the industry procurement practice of buying under a mixture of spot, mid-term, and long-term contracts

---

[1]   *See, e.g., National Association of Regulatory Utility Commissioners v. U.S. Department of Energy*, Case No. 11-1066 (D.C. Cir. November 19, 2013) (slip op. at 3-4).

To ensure that DOE complies with mandate of Section 3112(d)(2), DOE should also consider a flexible (or dynamic) sales process that enables DOE to obtain maximum value by selling when the market is strong and retreating in a weakening market. This has the added benefit of minimizing the adverse impact of DOE uranium sales on the domestic mining, conversion, and enrichment industries.

## Market Assessment Should Reflect the Real Market

The economic model used to determine adverse material impacts should be appropriately tailored for the structure of the domestic conversion market. More specifically, the underlying economic model should:

- Analyze actual sales data, including both historic and forward sales, to ensure that lost/displaced sales are appropriately recognized and accounted for in the assessment
- Consider the effects of spot price on production volumes
- Consider the effects of pricing/sales volume changes on near-, mid-, and long-term investment plans
- Recognize the limits of any economic model in a market that exhibits very low liquidity

The model should be validated against actual historic transactions, price movement, and the predictions made in previous Economic Resources International assessments. This action will inform the accuracy of the economic assessments to date. The model should also be subject to independent verification to ensure that there is a robust economic basis for the Secretarial Determination.

## Consider Current and Future Supply and Demand

Several broad supply and demand issues associated with the uranium market affect the extent of the impacts to the conversion industry caused by DOE's excess uranium sales. To ensure that DOE's impact assessment reflects the realities of the current (and future) market, DOE should consider the following factors:

- Demand should consider the actual forward open demand at the time of the assessment, rather than the total demand
- When assessing impacts on the conversion market, Russia, China and India should be excluded from forward demand because those markets are closed to sales from the domestic conversion industry
- Forward demand from Japanese reactors should be assumed to be zero until 2018, and then be assumed to ramp up on a realistic schedule based on the number of reactor restarts and inventories accumulated since reactor shutdowns
- Loss of sales resulting from planned reactor shutdowns in Germany should take account of the actual impact to the domestic industry as well as the anticipated future impact

- Enricher underfeeding must be properly accounted for in the supply side and should be assumed to be market clearing
- Russian supply into the U.S. market via the TSA agreement with USEC and direct sales under the Suspension Agreement should be assumed to be market clearing, up to existing quota limits
- In assessing the reduction in demand and loss of sales to the domestic industry, DOE should consider the effects of prior uranium inventory dispositions/transfers
- In relation to LEU transferred to NNSA contractors for down-blending, DOE should assess the displacement of working and strategic stocks
- In relation to U.S. demand, DOE should assess recent and anticipated reactor shutdowns and account for increasing pressures on the nuclear fleet from the wholesale electricity markets

We appreciate the opportunity to provide input on DOE's biennial review of the impacts of excess uranium sales on the domestic uranium mining, conversion, and enrichment industries and stand ready to provide you with the data necessary for you to conduct a realistic and accurate economic assessment of the effects of DOE excess uranium sales.


Yours sincerely

Malcolm Critchley

ConverDyn
President & CEO


Cc:
Ernest Moniz, US Secretary of Energy
Daniel Ponemon, Deputy Secretary of Energy
David Huizenga, Senior Advisor, Office of Environmental Management
Jim Owendoff, Acting Principal Deputy Assistant Secretary, Office of Environmental Management