# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
CONVERDYN,                                )
                                          )
                    Plaintiff,            )
                                          )
         v.                               )        Civil Action No. 14-1012 (RBW)
                                          )
ERNEST J. MONIZ,                          )
In his official capacity as Secretary     )
of the United States Department of Energy,)
                                          )
and                                       )
                                          )
UNITED STATES DEPARTMENT                  )
OF ENERGY,                                )
                                          )
                    Defendants.           )
_____ )

## MEMORANDUM OPINION

Plaintiff ConverDyn brings suit against the United States Department of Energy

("Department") and the Secretary of the Department, Ernest J. Moniz, in his official capacity,

alleging that certain actions taken by the Department are arbitrary and capricious and were

undertaken without notice and comment in violation of the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 706(2)(A), 553 (2012), and the United States Enrichment Corporation

Privatization Act ("Privatization Act"), 42 U.S.C. § 2297h-10 (2012).  Complaint ("Compl.") ¶¶

118–38.  Shortly after filing its complaint, ConverDyn moved for a preliminary injunction.

Following oral argument, the Court denied ConverDyn's motion for the reasons set forth below.[1]

---

[1] The Court considered the following documents in reaching its decision: (1) Plaintiff ConverDyn's Motion for a Preliminary Injunction ("Pl.'s Mot."); (2) the defendants' Opposition to Motion for Preliminary Injunction ("Defs.' Opp'n"); (3) Plaintiff ConverDyn's Reply in Support of Motion for a Preliminary Injunction ("Pl.'s Reply"); (4) Brief of Babcock & Wilcox Nuclear Operations Group, Inc., as Amicus Curiae, In Support of Defendants' Opposition to Motion for Preliminary Injunction ("Amicus Br."); and (5) Plaintiff ConverDyn's Response to

(continued . . .)

# I. BACKGROUND

## A. The Nuclear Fuel Cycle and Uranium Market

The production of nuclear fuel requires several steps: (1) uranium ore is mined and then milled and refined into uranium concentrate, referred to as "natural uranium," "yellowcake," or $U_{308}$, (2) the natural uranium is converted into uranium hexafluoride ($UF_6$ or UF6), or "feed uranium," which is a gas, and (3) the uranium hexafluoride is enriched to either become low-enriched uranium or high-enriched uranium, depending on the concentration of $U^{235}$, the fissionable uranium isotope. Nuclear Fuel Cycle, www.energy.gov/ne/nculear-fuel-cycle (last visited July 23, 2014); see also USEC Inc. v. United States, 259 F. Supp. 2d 1310, 1314 (Ct. Int'l Trade 2003). Low-enriched uranium can be created from high-enriched uranium by diluting it through the addition of natural or depleted uranium in a process called "down-blending." Defs.' Opp'n at 6 n.3.

Uranium is valued based on the cost of the different components of the product, each of which have separate market values and can be traded separately. Pl.'s Mot., Exhibit ("Ex.") C (Declaration of Malcolm Critchley ("Critchley Decl.")) ¶ 32. The value of unenriched uranium hexafluoride has two components, the natural uranium and the cost of conversion, whereas the value of low-enriched uranium has three components, the natural uranium, the cost of conversion, and the cost of enrichment. Id. Uranium is valued in two ways: the "spot price" is the price for uranium and related services which will be delivered within twelve months of purchase, and the "term price" is the price for uranium and related services which will be delivered more than one year after purchase. Pl.'s Mot. at 3 n.2 (citing Pl.'s Mot., Ex. B (2014

---

(. . . continued)
Babcock & Wilcox Nuclear Operations Group, Inc.'s Brief, as Amicus Curiae, In Support of Defendants' Opposition to Motion for Preliminary Injunction ("Pl.'s Amicus Resp.").

Review of the Potential Impact of DOE Excess Uranium Inventory On the Commercial Markets ("2014 Report")) at 87.

Both ConverDyn and the Department are participants in the domestic uranium market. ConverDyn is the only domestic provider of conversion services. <u>See</u> Pl.'s Mot., Ex. B (2014 Report) at 11. It operates a conversion plant in Metropolis, Illinois called Metropolis Works. <u>See</u> <u>id.</u> The Department "holds inventories of uranium in various forms and qualities, including highly enriched uranium . . . , low-enriched uranium . . . , natural uranium . . . , and depleted uranium . . . , that are currently held as excess and not dedicated to U.S. national security missions" that it sells from time to time. Defs.' Opp'n at 6 (citing Pl.'s Mot., Ex. L (July 2013 Excess Uranium Inventory Management Plan ("2013 Plan")) at iv). The remainder of the Department's inventory comes from government weapons programs and from the purchase of Russian-origin natural uranium. <u>Id.</u> (citing Pl.'s Mot., Ex. L (2013 Plan) at 8–12).

## B. The Privatization Act

In 1996, Congress enacted the Privatization Act, which includes various provisions relating to the transfer of the interest in the United States Enrichment Corporation, a government corporation previously established by the Energy Policy Act of 1992. 42 U.S.C. §§ 2297h-1 to - 9, -12. The Act states that "[t]he Secretary shall not provide enrichment services or transfer or sell any uranium (including natural uranium concentrates, natural uranium hexafluoride, or enriched uranium in any form) to any person except as consistent with this section." <u>Id.</u> § 2297h-10(a). In addition to exceptions for transfers authorized under the Russian High Enriched Uranium Agreement, <u>id.</u> § 2297h-10(b), transfers to the United States Enrichment Corporation, <u>id.</u> § 2297h-10(c), and transfers within the federal government, <u>id.</u> § 2297h-10(e), the Privatization Act also provides that "the Secretary may, from time to time, sell natural and low-enriched uranium (including low-enriched uranium derived from highly enriched uranium) from

the Department of Energy's stockpile." Id. § 2297h-10(d)(1).  The Act further provides, however, that:

> no sale or transfer of natural or low-enriched uranium shall be made unless—
>
> (A)     the President determines that the material is not necessary for national security needs,
>
> (B)     the Secretary determines that the sale of the material will not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry, taking into account the sales of uranium under the Russian [High Enriched Uranium] Agreement and the Suspension Agreement, and
>
> (C)     the price paid to the Secretary will not be less than the fair market value of the material.

Id. § 2297h-10(d)(2).  Determinations under this section remain valid for two years only.

Consolidated Appropriations Act, 2012, Pub. L. 112-74, § 312(a), 125 Stat. 786, 878 (2011); Consolidated Appropriations Act, 2014, Pub. L. 113-76, § 306(a), 128 Stat. 5, 175 (2014).

### C.  The 2008 and 2013 Excess Uranium Inventory Management Plans

On March 11, 2008, then-Secretary of the Department of Energy Samuel W. Bodman signed a document entitled "Secretary of Energy's Policy Statement on Management of the Department of Energy's Excess Uranium Inventory."  Pl.'s Mot., Ex. D (December 16, 2008 United States Department of Energy Excess Uranium Inventory Management Plan ("2008 Plan")) at A-1 to A-4.  As relevant here, this document stated

> The Department of Energy has a significant inventory of uranium that is excess to United States defense needs.  This inventory is expensive to manage and to secure, and consists of uranium in various forms, most of which are not readily usable.  However, in light of the significant increases in market prices for uranium in recent years, the uranium in this inventory is a valuable commodity both in terms of monetary value and the role it could play in achieving vital Departmental missions and maintaining a healthy domestic nuclear infrastructure.  This Policy sets forth the general framework within which the Department prudently will manage its excess uranium inventory.

4

> To the extent practicable, the Department will manage its uranium inventories in a manner that is consistent with and supportive of the maintenance of a strong domestic nuclear industry. Consistent with this principle, the Department believes that, as a general matter, the introduction into the domestic market of uranium from Departmental inventories in amounts that do not exceed ten percent of the total annual fuel requirements of all licensed nuclear power plants should not have an adverse material impact on the domestic uranium industry. The Department anticipates that it may introduce into the domestic market, in any given year, less than that amount, or, in some years for certain special purposes such as the provision of initial core loads for new reactors, more than that amount. Consistent with applicable law, the Department will conduct analyses of the impacts of particular sales or transfers on the market and the domestic uranium industry, prior to entering into particular sales or transfers.

Id. at A-1 to A-2. This "Policy Statement" was attached as an appendix to a document entitled "United States Department of Energy Excess Uranium Inventory Management Plan" dated December 16, 2008, which contained substantially similar language and identified transfers that were ongoing, planned, and under consideration. Id. at ES-1 to ES-2. At the end of the 2008 Plan's Executive Summary, the Department indicated that "[w]hile this Plan's focus is a 10-year period, the disposition of [the Department's] excess uranium inventories identified in this Plan is expected to take about 25 years" and that the Department "expects to periodically update the Plan to reflect new and evolving information, policies and programs." Id. at ES-2. Neither the Policy Statement nor the 2008 Plan were published in the Federal Register or subject to notice and comment.

In July 2013, the Department transmitted to Congress a second Excess Uranium Inventory Management Plan pursuant to Section 312(c) of the Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786 (2011). Pl.'s Mot., Ex. L (2013 Plan) at ii–iii. The 2013 Plan's Executive Summary stated in relevant part:

> On December 16, 2008, [the Department] issued its Excess Uranium Inventory Management Plan (2008 Plan), setting forth possible uses for these inventories. This updated Excess Uranium Inventory Management Plan (2013 Plan) replaces

the 2008 Plan and reflects updated and evolving information, programs, and mission needs, including additions to and deletions from the inventory and changes to [the Department's] uranium management strategy.

The 2013 Plan identifies uranium inventories that have entered the commercial uranium market since the issuance of the 2008 Plan, as well as transactions that are ongoing or being considered by [the Department] through Calendar Year (CY) 2018. The 2013 Plan's objectives include providing current information and enhanced transparency to the general public and interested stakeholders regarding the management of [the Department's] potentially marketable uranium. The planned and prospective sales or transfers of uranium into the commercial market identified in [the] 2013 Plan reflect current and reasonably foreseeable [Department] mission needs. The ongoing strategies, plans, and prospective actions in this Plan are not commitments to specific activities on the part of [the Department] beyond those that have already been contracted nor are they restrictions on actions that may be required in the future as a result of changing conditions, and all future actions will follow applicable legal requirements. [The Department] anticipates periodically updating the Plan, as necessary, to reflect new and evolving information, policies, and programs.

Id. at iv. The 2013 Plan's Executive Summary then identified specific transfers that were considered in the May 2012 Secretarial Determination required under Section 2297h-10(d). Id. at v. It then continued:

The May 2012 Determination addresses the market impact of transferring specific quantities and types of [the Department's] excess uranium inventories through 2021. Under Section 312(a) of the Consolidated Appropriations Act, 2012, determinations by the Secretary pursuant to [Section 2297h-10(d)] of the [Privatization Act] remain valid for only two calendar years from the date of issuance. Thus, the Department anticipates revisiting the potential market impact for transfers of uranium, covered under [Section 2297h-10(d)] of the [Privatization Act], every two years if it seeks to continue the covered transfers.

Id. The introduction to the 2013 Plan itself contained the following passage:

The 2008 Plan included reference to a Departmental guideline that, as a general matter, the introduction into the domestic market of uranium from Departmental inventories in amounts that do not exceed 10 percent of the total annual fuel requirements of all nuclear power plants should not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry.[FN 1] The 2008 Plan noted that the Department might introduce into the domestic market, in any given year, less than that amount, or, in some years for certain special purposes such as the provision of initial core loads for new reactors, more than that amount. Based on the experience gained since issuance of the 2008 Plan[FN 2], including in particular the market impact analysis that supported the

> May 15, 2012 Secretarial Determination . . . , the Department has determined that it can meet its statutory and policy objectives in regard to [Department] uranium sales or transfers without an established guideline. In addition, . . . decisions to introduce uranium into the market pursuant to [Section 2297h-10(d)] must be reviewed every two years. Accordingly, the 10 percent guideline will no longer be used.
>
> [FN 1] Even with this guideline, any transfer subject to [Section 2297h-10(d)] of the [Privatization Act] still underwent a market impact analysis to ensure there was no adverse material impact.
>
> [FN 2] Subsequent to issuance of the 2008 Plan, in 2009 the Department issued its "Finding of No Significant Impact: Disposition of [Department] Excess Depleted Uranium, Natural Uranium, and Low Enriched Uranium." 74 Fed. Reg. 31420 (July 1, 2009); DOE/EA-1607. In the mitigation action plan . . . of that finding, [the Department] determined that any potentially significant impacts on the domestic uranium industry from the sale or transfer of depleted uranium could [be] addressed by conducting a market impact analysis similar to those conducted in accordance with [Section 2297h-10(d)] and, if necessary, adjusting sales or transfers to avoid or mitigate any potentially significant impacts.

Id. at 2 (footnotes in original). The 2013 Plan was neither published in the Federal Register nor was it subject to notice and comment.

### D. The 2014 Secretarial Determination

In preparation for issuing the 2014 Secretarial Determination required by Section 2297h-10(d) of the Privatization Act, the Department contracted with Energy Resources International, Inc., "an experienced and well-regarded nuclear fuel consulting firm," to prepare an analysis of "the potential impact on the domestic uranium mining, conversion and enrichment industries from [the Department's] transfers or sales of uranium being proposed or considered in 2014-2033." Defs.' Opp'n, Attachment ("Attach.") 1, Ex. 1-C (May 12, 2014 Memorandum for the Secretary) ("2014 Memorandum")) at 2. Regarding the current state of the uranium market, the Energy Resources International report observed:

> The global uranium, conversion and enrichment industries are all in a state of considerable over-supply, with mainly discretionary near-term demand for nuclear fuel and a decline of long-term contracting over the past year. While long-term prospects for nuclear power growth and subsequent growth in fuel supply are generally viewed as positive, particularly for the uranium market, the amount of time it will take to recover from the post-Fukushima-driven state of the current markets is unclear. It is clear that excess supply will need to be reduced before any recovery in market price can take place. In the meantime, the

domestic industries are feeling the effects of the oversupplied markets and are taking actions, such as production and staffing cutbacks, in order to try to weather the downturn. The impacts are most acute in the uranium and conversion industries.

Pl.'s Mot., Ex. B (2014 Report) at ES-2. With respect to the volume of the Department's planned transfers, the Report noted:

The [Department] inventory transfers that are expected to displace commercial supply in the markets over the next ten years (2014 through 2023) average nearly 2,850 [metric tons of uranium] as $UF_6$ equivalent to 7.4 million pounds $U_3O_8$ per year. This is equivalent to approximately 15% of annual U.S. uranium requirements and 15% of U.S. conversion requirements.

Id. at ES-5. And finally, as to the effects of the planned transfers on the domestic conversion industry, the 2014 Report concluded that:

Estimating that [ConverDyn]'s pre-Fukushima sales volume ranged from 10 million to 12 million kgU as $UF_6$ and estimating its U.S. and world market shares, the introduction of [Department] inventory into the conversion market results in a sales volume impact of 0.6 to 0.7 million kgU, which is a 7% to 8% reduction in sales volume. This is on top of [ConverDyn]'s stated 25% sales volume loss associated with Fukushima.

. . . .

The production of $UF_6$ has high fixed costs. The loss of sales volume associated with . . . the entry of [Department] material in the conversion market, assuming that the fixed portion of production costs range from 80% to 100%, results in a production cost increase of 6% to 8%.

. . . .

Prior to the 2012-2013 temporary shutdown of Metropolis Works for seismic upgrades, the work force was approximately 334. When the plant returned to production in July 2013, the workforce was 270 employees, 80% of the pre-shutdown workforce. According to plant managers, the decrease in work force was due to lower market demand, a portion of which was the result of the impact of [Department] inventory on [ConverDyn] sales volume as summarized above.

Id. at ES-8 to ES-9. Based on its analysis, Energy Resources International determined that "it is not clear that a reduction in [Department] inventory releases would cause the overall market conditions to change enough to make a significant difference in the health and status of the

domestic industries." Id. at ES-10. The 2014 Report did not reach the ultimate issue of whether

the transfers would have an "adverse material impact" because that determination is committed

to the Secretary alone under the Privatization Act. Id. at ES-11.

In addition to the 2014 Report, the Department met formally and informally with

representatives from the uranium industry, including representations from ConverDyn, Defs.'

Opp'n, Attach. 1, Ex. 1-A ([Office of Nuclear Energy] Analysis of the Potential Impacts of

Planned [Department] Uranium Transactions (Redacted Version) ("Nuclear Energy Analysis"))

at 8; received materials from the Uranium Producers of America and ConverDyn, id.; and

received input from one of the government contractors who receives uranium in the

Department's planned transactions, id. at 9. The Office of Nuclear Energy concluded that the

planned transfers would not have an adverse material impact on the domestic uranium mining,

conversion, and enrichment industry, reasoning that:

> [u]pon reviewing the [2014 Report] and other reports as well as meeting with
> industry on many occasions, it is clear that the nuclear fuel market (it is a global
> market) is in a weakened state due to many factors . . . . It is important to note
> that [the Department's] uranium transfers . . . are significantly less of an impact
> than the other factors.
>
> Industry meetings continue to help in understanding their concerns and advice
> related to the sale of [Department] uranium into the market. First and foremost,
> the industry looks for [the Department] to be transparent and a predictable source
> of supply. In this respect, our data given to [Energy Resources International] for
> analysis laid out our absolute best estimation of planned [Department] sales from
> this year through 2033.
>
> . . . .
>
> The Secretary, in determining whether [Department] uranium sales would create
> an "adverse material impact", must answer whether [Department] uranium sales
> alone cause the uranium industry to change from its position in the market
> without [Department] sales. The expert staff within the Office of Nuclear Energy
> believe that the uranium industry would be in the same position in the market with
> or without [Department] sales due to the limited ability of the relatively small
> amount of material and services being displaced to significantly influence the
> domestic uranium mining, conversion, and enrichment industries. We believe

that it is much more important for [the Department] to adhere to its stated plans and provide industry with a predictable supply on which they can base their business decisions[.]

Id. at 11–12. The May 12, 2014 Memorandum prepared for the Secretary recommending approval of the 2014 Secretarial Determination echoed this conclusion, stating that the 2014 Report "supports a conclusion that although [the Department's] actions will necessarily have some impact on the market, and that this impact is greater now than it was in 2012, [its] actions are not the driver of the current negative states on the domestic uranium production, conversion, or enrichment industries." Defs.' Opp'n, Attach. 1, Ex. 1-C (2014 Memorandum) at 3. With respect to the views of the affected industry, the Memorandum stated that "[a]ll industry participants note the importance of [Department] predictability in supporting stable markets and a strong domestic industry" and "[g]iven this, the offices engaged in uranium transactions strongly believe that it is necessary to continue to adhere to the 2013 Excess Uranium Management Plan." Id.

The Secretary ultimately approved the 2014 Secretarial Determination finding no adverse material impact on the domestic uranium mining, conversion, and enrichment industry on May 15, 2014. Pl.'s Mot., Ex. M. The 2014 Secretarial Determination authorizes the transfer of "up to 2,055 [metric tons of uranium] per year of natural uranium equivalent contained in natural uranium and natural uranium from off-specification non-uranium hexafluoride transferred to [Department] contractors for cleanup services at the Paducah or Portsmouth Gaseous Diffusions Plants" and "up to 650 [metric tons of uranium] per year of natural uranium equivalent contained in low-enriched uranium . . . transferred to [National Nuclear Security Administration] contractors for down-blending highly-enriched uranium to [low-enriched uranium] for [National Nuclear Security Administration] programs." Id.

Two Department programs are funded in whole or in large part through the planned transfers. Defs.' Opp'n at 8. The first is the clean-up of environmental contamination at the Department's Gaseous Diffusion Plant in Portsmouth, Ohio. Id. at 9. Since 2010, the Department has contracted with Fluor-B&W Portsmouth to provide clean-up services, a portion of which are paid for with quarterly uranium transfers. Id. at 8–9. The second is an ongoing effort to down-blend high-enriched uranium that is no longer needed for weapons pursuant to a 1993 Presidential Directive. Id. at 8. The Department contracts with WesDyne, who in turn contracts with Nuclear Fuel Services, Inc. for down-blending services, which are paid for with the transfer of a percentage of the resulting low-enriched uranium. Id.

**E. The Current Litigation**

ConverDyn filed suit on June 13, 2014, alleging that the Department is acting in excess of its statutory authority by transferring conversion services, that the 2014 Secretarial Determination's finding that the planned transfers will have no "adverse material impact" is arbitrary and capricious, and that the Department will receive less than fair market value for the planned transfers, in violation of the Privatization Act and the APA. Compl. ¶¶ 118–30. ConverDyn also alleges that the Department's 2013 Excess Uranium Inventory Management Plan is arbitrary and capricious and that the Department's failure to follow notice and comment procedures prior to its release violates the APA. Id. ¶¶ 131–38.

On June 23, 2014, ConverDyn filed its motion for a preliminary injunction seeking to enjoin all of the transfers identified in the 2014 Secretarial Determination. Pl.'s Mot. at 37. The Department scheduled those transfers to take place incrementally on July 15, 2014, August 15, 2014, and September 15, 2014. Pl.'s Mot., Ex. Q (Letters from the Department to the Honorable Diane Feinstein and the Honorable Barbara Mikulski). Upon learning of ConverDyn's intent to file a motion requesting the Court to enjoin the transfers, the Department delayed the first

transfer to July 31, 2014, in order to allow full briefing on the motion. Pl.'s Mot. at 3 n.1.

Babcock & Wilcox Nuclear Operations Group, Inc. ("Babcock") subsequently filed an amicus

curiae brief in support of the defendants' opposition to ConverDyn's motion. Babcock's

subsidiary, Nuclear Fuel Services, Inc., provides the down-blending services that will be paid for

with the funds acquired from the contested transfers. Amicus Br. at 3–4.

The Court held oral argument on ConverDyn's motion on July 29, 2014 and later that

day, issued an order denying the motion for failure to show irreparable harm, with an indication

that this opinion setting forth the Court's reasoning in full would be issued later. ECF No. 31.

## II. STANDARD OF REVIEW

The purpose of a preliminary injunction "'is merely to preserve the relative positions of

the parties'" until the case can be resolved. Chaplaincy of Full Gospel Churches v. England, 454

F.3d 290, 297 (D.C. Cir. 2006) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).

"'A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on

the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3]

that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest.'"

Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting Winter v. Natural Res. Def.

Council, Inc., 555 U.S. 7, 20 (2008)) (some alterations in original). Because it is "an

extraordinary remedy," a preliminary injunction "should be granted only when the party seeking

the relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251,

258 (D.C. Cir. 2004) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

The District of Columbia Circuit has applied a "sliding scale" approach in evaluating the

preliminary injunction factors. Sherley, 644 F.3d at 392. Under this analysis,

> [i]f the movant makes an unusually strong showing on one of the factors, then it
> does not necessarily have to make as strong a showing on another factor. For
> example, if the movant makes a very strong showing of irreparable harm and

there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success. Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors must be balanced against each other.

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citations and internal quotation marks omitted).[2] However, "a movant must demonstrate at least some injury for a preliminary injunction to issue, for the basis of injunctive relief in the federal courts has always been irreparable harm." Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (internal citations and quotation marks omitted). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." Id.

### III. LEGAL ANALYSIS

As explained in the Court's July 29, 2014 order denying ConverDyn's motion, the Court finds that ConverDyn has failed to demonstrate irreparable harm, as it must for the issuance of a preliminary injunction. See id. The Court, therefore, begins its discussion with this factor.

### A. Irreparable Harm

In this Circuit, a litigant seeking a preliminary injunction must satisfy "a high standard" for irreparable injury. Id. The asserted injury "must be both certain and great; it must be actual

---

[2] Several members of the Circuit have read the Supreme Court's decision in Winter to cast doubt on the continued validity of the sliding scale approach. See Davis, 571 F.3d at 1296 (Kavanaugh, J., joined by Henderson, J., concurring) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things" (emphasis in original)); Sherley, 644 F.3d at 393 ("Like our colleagues, we read Winter at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" (quoting Davis, 571 F.3d at 1296 (concurring opinion))). But the Circuit has had no occasion to decide this question because it has not yet encountered a post-Winter case where a preliminary injunction motion survived the less rigorous sliding-scale analysis. See Sherley, 644 F.3d at 393 ("We need not wade into this circuit split today because, as in Davis, . . . a preliminary injunction is not appropriate even under the less demanding sliding-scale analysis."). Thus, because it remains the law of this Circuit, the Court must employ the sliding-scale analysis here.

and not theoretical," and the movant must show that "[t]he injury complained of [is] of such <u>imminence</u> that there is a clear and present need for equitable relief to prevent irreparable harm." <u>Wis. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (alterations in original) (citations and quotation marks omitted). A party seeking a preliminary injunction "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." <u>Id.</u>

Additionally, the injury "must be beyond remediation," <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at 297, and therefore, in general, "economic loss does not, in and of itself, constitute irreparable harm," <u>Wis. Gas. Co.</u>, 758 F.2d at 674. "[M]onetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." <u>Id.</u> And while "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm," the "recoverability of monetary losses can, and should, have some influence on the irreparable harm calculus." <u>Nat'l Mining Ass'n v. Jackson</u>, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) (Walton, J.).

ConverDyn alleges that the contested transfers "will directly cause [it] to sustain $40.5 million in lost profits over the next two years," and "will likely cost [it] an additional $29 million in lost revenue due to changed customer buying habits." Pl.'s Mot. at 30. "As a result," ConverDyn asserts, "the transfers may cause a shift from a profit to a loss in one of the next few years." <u>Id.</u> ConverDyn relies, in part, on the declaration of Malcolm Critchley, president and Chief Executive Officer of ConverDyn. <u>Id.</u> In his declaration, Critchley states that "[Department] transfers under the May 2014 Secretarial Determination will reduce ConverDyn's profits by more than $10 million per year." Pl.'s Mot., Ex. C (Critchley Decl.) ¶ 20. ConverDyn also relies on the 2014 Report, which predicts that the contested transfers will cause a 7–8% reduction in ConverDyn's sales, a 6–8% increase in its production costs, and a 12% and 6% decline in conversion spot and conversion term price respectively. <u>Id.</u> ¶¶ 20–26.

While ConverDyn's projected losses are quite significant, if accurate, ConverDyn has nonetheless failed to meet this Circuit's stringent standard for establishing irreparable harm. As an initial matter, ConverDyn focuses its claim for relief on its projected losses of $40.5 million, but this figure reflects losses from the Department's transfers over the next two years, Pl.'s Mot. at 30, and therefore gives the Court little insight into the magnitude of its loss during the pendency of this case. Because the purpose of a preliminary injunction is to preserve the parties' respective positions only until the case is resolved, Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (citing Univ. of Tex., 451 U.S. at 395), this omission is significant, see Holiday CVS, L.L.C. v. Holder, 839 F. Supp. 2d 145, 170–71 (D.D.C. 2012) (Walton, J.) (finding that the plaintiff had failed to demonstrate irreparable injury because it did not provide estimated economic losses for the relevant time period), vacated as moot, 493 F. App'x 108, 108 (D.C. Cir. 2012). Although ConverDyn contends that "[e]ach and every transfer has an immediate and continuing adverse impact on the market for conversion services in its current over-supplied condition," Pl.'s Mot. at 31, it presents nothing to the Court to quantify this impact, which must not be merely "an immediate and continuing adverse impact," id., but a loss significant enough to merit preliminary injunctive relief, because generally, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough," Wis. Gas Co., 758 F.2d at 674 (citation omitted). Without such evidence, it is also impossible to assess whether Converdyn's harm is sufficiently imminent to warrant a preliminary injunction.

Furthermore, ConverDyn's evidence does not establish that its alleged losses "threaten[] the very existence of [its] business," id., the only circumstance in which this Circuit has endorsed a finding of irreparable harm based on monetary loss, see Nat'l Mining Ass'n, 768 F. Supp. 2d at 54 n.13. While it is clear that the asserted losses, if accurate, would be significant, see Pl.'s Mot., Ex. C (Critchley Decl.) ¶ 20, ConverDyn does not claim that the Department's transfers

will force it out of business or even state with certainty that the losses will be significant enough to force the business to operate at a loss, see id. (stating that losses "may cause a shift from a profit to a loss in one of the next few years" (emphasis added)). Instead, Critchley asserts only that the contested transfers threaten ConverDyn's "long-term viability," id. ¶ 13, a characterization that underscores ConverDyn's deficient showing here. In general, substantial financial losses are simply not sufficient to merit preliminary injunctive relief unless they are of a magnitude to threaten the movant's business. See Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC, 762 F. Supp. 2d 8, 15 (D.D.C. 2011) ("The critical consideration under this exception is the effect that the purported economic harm will have on a movant's business or its very existence—not any monetary amount per se."); N. Air Cargo v. U.S. Postal Servs., 756 F. Supp. 2d 116, 126 n.9 (D.D.C. 2010) ("In determining whether a party requesting interim injunctive relief has demonstrated irreparable harm, the focus of the Court's inquiry is on the magnitude of harm that will be suffered by the moving party, not the particular amount of economic damages that the plaintiff will suffer."). ConverDyn, however, has failed to even allege—let alone demonstrate—that the losses it faces are substantial enough to "threaten[] the very existence of [its] business," Wis. Gas Co., 758 F.2d at 674, a deficiency that other members of this Court have found dispositive of the irreparable harm inquiry, see, e.g., Mylan Labs., Inc. v. Leavitt, 484 F. Supp. 2d 109, 123 (D.D.C. 2007) (finding movants' failure to allege that million dollar projected losses in absence of injunction would threaten the continued existence of their business dispositive of irreparable injury prong).

Even disregarding this failure, ConverDyn's projected losses do not rise to the level of irreparable harm. A claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief. See Holiday CVS, 839 F. Supp. 2d at 169–70; N. Air Cargo, 756 F.

Supp. 2d at 125–26, 126 n.9; LG Elecs. U.S.A., Inc. v. Dep't of Energy, 679 F. Supp. 2d 18, 36

(D.D.C. 2010). ConverDyn's alleged loss of $10 million per year, assuming arguendo that this

estimate is accurate, is not of sufficient magnitude in light of ConverDyn's annual revenues of

$100 million.[3] See Pl.'s Reply, Ex. W (Supplemental Declaration of Malcolm Critchley ("Supp.

Critchley Decl.")) ¶ 10. Other members of this Court have previously held that similar financial

harms do not rise to the level of irreparable harm. See Varicon Int'l v. Office of Pers. Mgmt.,

934 F. Supp. 440, 447–48 (D.D.C. 1996) (finding loss of contract resulting in ten percent

decrease in revenues insufficient to show irreparable harm); TGS Tech., Inc. v. U.S. Dep't of Air

Force, No. 92-0062(JHG), 1992 WL 19058, at *4 (D.D.C. 1992) (holding that plaintiff had failed

to demonstrate irreparable injury when loss of contract amounted to "only" twenty percent of

plaintiff's business).

ConverDyn's emphasis on the harm resulting from the mere entry of the Department's

uranium onto the market is also unpersuasive. Pl.'s Mot. at 31. "Courts within [this] Circuit

have generally been hesitant to award injunctive relief based on assertions about lost

opportunities and market share." Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 42–43

(D.D.C. 2000) (collecting cases). While not without precedent, "[l]oss of market share is simply

economic harm by another name," and thus a litigant must still demonstrate the considerable

magnitude of loss required in this Circuit to warrant preliminary injunctive relief. LG Elecs.

---

[3] As the defendants pointed out in their opposition brief and at oral argument, Defs.' Opp'n at 37–38, ConverDyn has a partnership relationship with General Atomics Energy Services and Honeywell International, Inc., Pl.'s Mot., Ex. B (2014 Report) at 11; see also Compl. ¶ 14, the latter being a Fortune 100 corporation with total revenues of $39.1 billion in 2013, Today's Honeywell Corporate Overview, available at honeywell.com/About/Pages/our-company.aspx (last visited Aug. 21, 2014). Honeywell owns the Metropolis Works plant and ConverDyn "is the exclusive agent for 'conversion' sales" from that plant. Pl.'s Mot., Ex. C (Critchley Decl.) ¶ 2. ConverDyn notes that it "is a separate legal entity (a 50-50 partnership between Honeywell Energy Services and General Atomics Energy Services), has stand-alone financial statements, and prepares a separate annual federal partnership tax return each year." Pl.'s Reply, Ex. W (Supp. Critchley Decl.) ¶ 11. While the precise structure of ConverDyn's relationship with Honeywell is not clear from the current record, Honeywell's involvement strongly suggests that the real impact of ConverDyn's alleged losses is even less than the figures used in the Court's analysis above.

U.S.A., 679 F. Supp. 2d at 36.  Here, the harm that ConverDyn identifies as resulting from the entry of the Department's uranium onto the market is the same financial harm—depressed market prices and lost sales—that the Court has already found insufficient.  For this reason, ConverDyn's analogy to cases involving the introduction of a generic drug onto the market falls flat.  In those cases, the plaintiffs identified other harms, such as loss of customer goodwill and loss of research and development funding.  Bayer HealthCare, LLC v. U.S. Food & Drug Admin., 942 F. Supp. 2d 17, 25-26 (D.D.C. 2013); Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20, 29 (D.D.C. 1997).  No other harm besides the financial effects identified and considered above exists here.  ConverDyn's argument regarding the impact of the transfers on the market is therefore of no assistance.

ConverDyn also contends that its economic damages are irreparable because it cannot recover its damages from the Department due to sovereign immunity.  Pl.'s Mot. at 32–33.  While this Court previously characterized economic damages that are unrecoverable due to sovereign immunity as "irreparable per se," Feinerman v. Bernardi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (Walton, J.), that characterization goes too far and the inability to recover economic losses can more accurately be considered as a factor in determining whether the movant has shown irreparable harm, Nat'l Mining Ass'n, 768 F. Supp. 2d at 53.  Otherwise, a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong, nullifying that requirement in such cases.  See Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the United States, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012); N. Air Cargo, 756 F. Supp. 2d at 125 n.6.  Moreover, a party seeking injunctive relief due to the inability to recover economic losses must nonetheless demonstrate that its harm will be sufficiently great to warrant a preliminary injunction.  See Air Transp. Ass'n, 840 F. Supp. 2d at 335; N. Air Cargo, 756 F. Supp. 2d at 125 & n.6 (citation omitted).  Indeed, the successful

movant in <u>Feinerman</u> had demonstrated that approximately forty percent of his business would be jeopardized in the absence of injunctive relief. 558 F. Supp. 2d at 50–51. And even there, all this Court found was that while the plaintiff "hardly present[ed] an overwhelming case for a finding of irreparable injury" he did show "that he [was] likely to suffer at least <u>some degree</u> of irreparable injury." <u>Id.</u> at 51 (emphasis added).

Taking all of the above circumstances into account, the Court finds that ConverDyn has failed to satisfy its heavy burden of showing irreparable injury.

**B. Likelihood of Success On the Merits**

Having failed to demonstrate irreparable harm, ConverDyn's motion for a preliminary injunction must be denied even if the other factors weigh in favor of injunctive relief. <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at 297. Nonetheless, the Court will briefly discuss the remaining three factors in order to provide the parties with a complete understanding of its balance of the four preliminary injunction factors. <u>Id.</u> at 304–05.

As the Court indicated during oral argument on this motion, ConverDyn has demonstrated a likelihood of success on the merits of at least one of its claims. Based on the record before the Court at this time, the Court agrees with ConverDyn that it is likely to prevail on its claim that the 2014 Secretarial Determination's finding that the planned transfers will have no "adverse material impact" is arbitrary and capricious in violation of the APA.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The 'arbitrary and capricious' standard of review as set forth in the APA is highly deferential," and the Court must "presume the validity of agency action." <u>Am. Horse Prot. Ass'n v. Yeutter</u>, 917 F.2d 594, 596 (D.C. Cir. 1990). Nonetheless, a reviewing court must ensure that the agency "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations and quotation marks omitted). An agency's decision will be considered arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id. However, a "court is not to substitute its judgment for that of the agency," and will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. (citations and quotation marks omitted).

Despite the high degree of deference accorded to agency action, the 2014 Secretarial Determination fails on multiple fronts. The Privatization Act requires that the Secretary "determine[] that the sale of the material will not have an adverse material impact on the domestic uranium mining, conversion, or enrichment industry." 42 U.S.C. § 2297h-10(d)(2)(B). Prior to issuing its determination, the Department received a detailed submission from ConverDyn outlining its projected financial losses caused by the Department's planned transfers. Defs.' Opp'n, Attach. 1, Ex. 1-A (Nuclear Energy Analysis) at 8. While the Department acknowledged receipt of these materials during its decisionmaking process, it nowhere addresses why the losses described in ConverDyn's submission do not constitute an "adverse material impact." As this Circuit has observed, "[u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (alterations in original) (citations and quotation marks omitted). The Department's "failure to respond meaningfully" to ConverDyn's

objections thus renders its decision arbitrary and capricious.  Id. (citations and quotation marks omitted).

Perhaps most troubling, however, is the Department's failure to address why the 2014 Report's conclusions regarding the effects of the Department's planned transfers on ConverDyn do not constitute an "adverse material impact."  The 2014 Report concluded that the Department's transfers would result in a 12% and 6% decrease in the conversion spot and term prices respectively, Pl.'s Mot., Ex. C (Critchley Decl.) ¶¶ 25-26, a 7–8% decrease in ConverDyn's sales volumes, and a 6–8% increase in its production costs, id. ¶¶ 20-22.  Neither the Nuclear Energy Analysis nor the May 2014 Memorandum explain why this data does not show an "adverse material impact."  Instead, the Department articulated the question before it as "whether [Department] uranium sales alone cause the uranium industry to change from its position in the market without [Department] sales."  Defs.' Opp'n, Attach. 1, Ex. 1-A (Nuclear Energy Analysis) at 12 (emphasis added).  The May 2014 Memorandum similarly interpreted the 2014 Report's data as finding "that a decrease in the quantity of [Department] transfers would do little to improve the market condition or reduce other impacts on the industry" and that "although [the Department's] actions will necessarily have some impact on the market, and . . . this impact is greater now than it was in 2012, [the Department's] actions are not the driver of the current negative states on the domestic uranium production, conversion, or enrichment industries." Defs.' Opp'n, Attach. 1, Ex. 1-C (2014 Memorandum) at 3 (emphasis added).  The Department's analysis on this point may be correct, but it is the answer to the wrong question.  Rather than assessing the evidence to determine whether the planned transfers would have an adverse material impact on the domestic uranium production, conversion, or enrichment industries as directed by Section 2297h-10(d), the Department instead reviewed the evidence to determine whether the planned transfers are the primary cause of the current depressed state of the uranium

market or whether altering the amount of the transfers would alleviate negative market conditions. And whether the Department's transfers are "the driver" of market conditions is not the inquiry set forth in Section 2297h-10(d). The Department's transfers may have an adverse material impact on ConverDyn even if the transfers are not the primary cause of ConverDyn's total losses. For this reason, the defendants' emphasis on "[t]he relatively small size of [the Department's] proposed transfer compared to global uranium supply" as the basis of the Department's conclusion similarly misses the mark. Defs.' Opp'n at 25–26. The Department may well be able to articulate a rational explanation for why the 2014 Report's projected losses by ConverDyn do not constitute an adverse material impact, but that has not been done. Because the Department has "relied on factors which Congress has not intended it to consider," State Farm, 463 U.S. at 43, and based on the record before the Court at this time, the Court finds that ConverDyn is likely to prevail on its claim that the 2014 Secretarial Determination is arbitrary and capricious in violation of the APA.

With respect to ConverDyn's other claims, however, the Court is unpersuaded that ConverDyn is likely to succeed. ConverDyn's argument that the Department is not authorized to transfer conversion services is belied by the broad authority granted to the Department's predecessor agencies in the Atomic Energy Act, the plain language of Section 2297h-10, and that Section's requirement that the Secretary determine that the Department's transfers will not have an adverse material impact on the domestic conversion industry. See Defs.' Opp'n at 27–29. As to ConverDyn's claim that the Department's receipt of the lower spot market price for its transfers does not constitute "fair market value" as required by Section 2297h-10(d)(2)(C), the Court is unconvinced. ConverDyn appears to concede that the Department is receiving fair market value in the spot market, see Pl.'s Reply at 14, and cites no authority—and this Court has found none—requiring the Department to obtain the very best possible price so long as it

receives fair market value. With respect to its claim that the Department was required to subject the 2013 Plan to notice and comment, it is apparent that both the 2008 and 2013 Plans are "general statements of policy" which are exempt from notice and comment requirements under the APA, see 5 U.S.C. § 553(b)(A), due to the non-binding language of the documents, the express reservation of the Department's ability to revise its plans, and both documents' failure to create any rights or impose any obligations, see Wilderness Soc'y v. Norton, 434 F.3d 584, 595 (D.C. Cir. 2006), and are insufficiently definitive to require notice and comment pursuant to Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 585-86 (D.C. Cir. 1997), and its progeny, see MetWest Inc. v. Sec'y of Labor, 560 F.3d 506, 509-10 (D.C. Cir. 2009). Finally, regarding ConverDyn's claim that the 2013 Plan is arbitrary and capricious because it is "contrary to its stated reasons," Compl. ¶ 134, Converdyn's scant argument on this claim, Pl.'s Mot. at 28–29, is not sufficiently developed to support its burden of establishing a likelihood of success on the merits for this claim. Accordingly, while the Court finds that ConverDyn is likely to succeed on the merits of its claim regarding the 2014 Secretarial Determination, the Court concludes that it has not established a likelihood of success on its other claims.

### C. Balance of the Equities

In evaluating whether a preliminary injunction should issue, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (citation and quotation marks omitted). As discussed above, ConverDyn asserts that it faces losses of $10 million annually as a result of the uranium transfers contemplated by the 2014 Secretarial Determination. Pl.'s Mot., Ex. C (Critchley Decl.) ¶ 20. ConverDyn also notes that staff levels at Metropolis Works were decreased in response to lower market demand due to the Department's past transfers, and that "it seems likely that, if [the Department] continues to drive down both the demand and the price

for uranium conversion services, more job losses will follow." Pl.'s Mot. at 35 (citing Pl.'s Mot., Ex. B (2014 Report) at 81, 83–84). In response, the Department contends that the issuance of a preliminary injunction "will effectively cripple" its clean-up of the Department's Gaseous Diffusion Plant in Portsmouth, Ohio, Defs.' Opp'n at 40-42, and its high-enriched uranium down-blending program in Erwin, both of which rely entirely or almost entirely on the Department's uranium transfers for funding, id. at 42-43. According to the Department, an injunction prohibiting the planned transfers will result in a loss of $160 million per year in funding for the Portsmouth clean-up and the consequent layoff of approximately 825 employees in 2014 and 2015, as well as an increase in the long-term cost of the project by up to $120 million per year. Defs.' Opp'n, Attach. 2 (Declaration of James M. Owendoff ("Owendoff Decl.")) ¶ 15. As to the down-blending program, the Department asserts that operations would: 1) cease entirely if it were unable to conduct the planned uranium transfers, which would cause the Department to incur "significant economic liability" due to its violation of its contract with the down-blending contractor, WesDyne; 2) "significantly undercut" the United States' international nonproliferation commitments; and 3) result in the layoff of fifty individuals employed by the Department's subcontractor. Defs.' Opp'n at 43 (citing Defs.' Opp'n, Attach. 3 (Declaration of Peter Hanlon ("Hanlon Decl.")) ¶ 25; Defs.' Opp'n, Attach. 4 (Declaration of Anne Harrington)).

In light of the substantial harm that the Department's two programs would incur if the planned transfers were prohibited, the Court finds that ConverDyn has not demonstrated that the balance of equities weighs in its favor. Indeed, "[i]t often happens that . . . one party or the other will be injured whichever course is taken," and so "[a] sound disposition . . . must [then] depend on a reflective and attentive appraisal as to the outcome on the merits." Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (some alterations in original) (citation and

quotation marks omitted). When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief. Allina Health Servs. v. Sebelius, 756 F. Supp. 2d 61, 69 (D.D.C. 2010) (finding that the balance of the equities weighs against issuing an injunction because the alleged economic injury to the movant would be offset by economic injury to the Department of Health and Human Services); see Serono Labs., 158 F.3d at 1326 (finding the balance of the harms "results roughly in a draw" where one of the parties would be harmed regardless of court's decision).

ConverDyn's argument that the Court should disregard the Department's alleged harms because "[a]ny impacts to [Department] programs would be due to [the Department's] own choices" is unavailing. Pl.'s Reply at 22. Even if the Court were inclined to penalize the Department for acting in reliance on its ability to transfer quantities of its uranium stockpile, subject, of course, to the restrictions imposed by the Privatization Act, issuance of a preliminary injunction would still harm innocent third parties—the employees that would be laid off due to the shutdown of the clean-up and down-blending programs. See Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (framing the balance of the equities element as ensuring "that an injunction would not substantially injure other interested parties"). The Court therefore finds it entirely appropriate to consider the Department's asserted harms in the balance of equities equation, regardless of whether the Department's actions may ultimately be found to violate the APA and the Privatization Act.

ConverDyn also contends that the balance of the equities tips in its favor because issuance of an injunction would preserve the status quo. Pl.'s Mot. at 33. ConverDyn's argument rests on a sound premise as "[t]he primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo,"

Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (citations and quotation marks omitted),
but ConverDyn's attempt to have it applied here is misplaced. Rather than maintaining the status
quo, ConverDyn's requested injunction prohibiting <u>all</u> of the Department's uranium transfers,
Pl.'s Mot. at 37, would alter the status quo, as the Department has annually transferred uranium
in quantities of approximately ten percent of domestic requirements since implementing the 2008
Plan, <u>see</u> Pl.'s Mot. at 8. Accordingly, the balance of the equities does not weigh in favor of
issuing ConverDyn's requested injunction.

### D. Public Interest

Like the balance of the equities, neither ConverDyn nor the Department emerges as the
clear winner in the Court's consideration of the public interest implicated by the requested
preliminary injunction. ConverDyn makes much of the Privatization Act's limitations on the
Department's ability to transfer uranium from its stockpile as reflecting Congress' judgment that
"preventing adverse impacts to these important domestic industries outweighs any need for [the
Department] to have unfettered authority to transfer uranium into the market," which, in
ConverDyn's view, indicates that "an injunction meant to avoid unnecessary harm to the
domestic conversion industry is in the public interest as determined by Congress." Pl.'s Mot. at
35. The Department, on the other hand, contends that the public interest favors denying
ConverDyn's motion so that the Department's clean-up and down-blending activities may
continue. Defs.' Opp'n at 40–43.

While it is true that the restrictions on the Department's uranium sales in Section 2297h-
10(d) reflect a concern about the impact of the Department's transfers on the domestic uranium
mining, conversion, and enrichment industry, <u>see</u> § 2297h-10(d)(2)(B), it does not follow that
Section 2297h-10(d) reflects a congressional choice between the competing interests raised here
because Congress was not faced with the precise choice presented to the Court when it enacted

Section 2297h-10.  The Court declines ConverDyn's invitation, <u>see</u> Pl.'s Reply at 21–22, to infer

that Congress' lack of appropriations for the Department's clean-up and down-blending

programs indicates that Congress has determined that those programs are unimportant.  <u>See</u> <u>In re</u>

<u>Aiken Cnty.</u>, 725 F.3d 255, 260 (D.C. Cir. 2013).  Moreover, another member of this Court has

previously recognized the public interest in the continuation of the Department's environmental

clean-up activities in other contexts.  <u>See, e.g.</u>, <u>Toxco Inc. v. Chu</u>, 724 F. Supp. 2d 16, 33

(D.D.C. 2010).  The Court, therefore, finds that ConverDyn has failed to demonstrate that the

public interest weighs in favor of preliminary injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that ConverDyn's motion for a

preliminary injunction must be denied.  ConverDyn has failed to demonstrate that it will suffer

irreparable harm in the absence of injunctive relief, a requirement for the issuance of a

preliminary injunction.  Moreover, while it has shown a likelihood of success on the merits on at

least one of its claims, it has not shown that the balance of the equities or the public interest

weighs in its favor.  ConverDyn has thus failed to carry its burden of establishing that it is

entitled to the extraordinary remedy of a preliminary injunction.

**SO ORDERED** this 12th day of September, 2014.[4]

REGGIE B. WALTON
United States District Judge

---

[4] An Order consistent with this Memorandum Opinion will be issued contemporaneously.